# FOR PUBLICATION
# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HEDELITO TRINIDAD Y GARCIA,
          *Petitioner-Appellee,*

v.

LINDA THOMAS,* Warden,
Metropolitan Detention Center-Los
Angeles,
          *Respondent-Appellant.*

No. 09-56999

D.C. No.
2:08-cv-07719-
MMM-CW

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted En Banc
June 23, 2011—Pasadena, California

Filed June 8, 2012

Before: Alex Kozinski, Chief Judge, Harry Pregerson,
Sidney R. Thomas, Susan P. Graber, Kim McLane Wardlaw,
William A. Fletcher, Marsha S. Berzon, Richard C. Tallman,
Richard R. Clifton, Milan D. Smith, Jr., and Sandra S. Ikuta,
Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge Thomas;
Dissent by Judge Tallman;
Partial Concurrence and Partial Dissent by Judge Berzon;
Partial Concurrence and Partial Dissent by Judge Pregerson;
Partial Dissent by Chief Judge Kozinski

---

*Pursuant to Fed. R. App. P. 43(c)(2), we *sua sponte* substitute Linda Thomas for Michael Benov as the respondent in this action.

**COUNSEL**

Douglas Neal Letter (argued), Lisa Olson and Scott R. McIntosh, United States Department of Justice, Civil Division, Appellate Staff, Washington, D.C.; Daniel Scott Goodman and Michael J. Raphael, Office of the United States Attorney, Los Angeles, California, for the respondent-appellant.

Craig Anthony Harbaugh (argued) and Sean Kevin Kennedy, Federal Public Defender's Office, Los Angeles, California, for the petitioner-appellee.

Lee Gelernt and Jennifer Chang Newell, American Civil Liberties Union Foundation, New York, New York, and San Francisco, California, for amicus American Civil Liberties Union.

## OPINION

PER CURIAM:

Trinidad y Garcia alleges that his extradition to the Philippines would violate his rights under the Convention Against Torture (CAT)[1] and the Fifth Amendment's Due Process Clause. The CAT is a treaty signed and ratified by the United States, but is non-self-executing. 136 Cong. Rec. 36,198 (1990). Congress, however, has implemented the treaty by statute as part of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA). 8 U.S.C. § 1231 note. That statute declares it "the policy of the United States not to . . . extradite . . . any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." *Id.* The statute requires that "the appropriate agencies . . . prescribe regulations to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture." *Id.*

The appropriate agency is the Department of State, and it adopted regulations specifying that, "[i]n each case where allegations relating to torture are made . . . , appropriate policy and legal offices review and analyze information relevant to the case in preparing a recommendation to the Secretary as to whether or not to sign the surrender warrant." 22 C.F.R. § 95.3(a). An extraditee may be surrendered only after the Secretary makes a determination regarding possible torture. *Id.* § 95.2-.3.

1. The district court had jurisdiction over the action pursuant to 28 U.S.C. § 2241, which makes the writ of habeas cor-

---

[1]United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, adopted by unanimous agreement of the U.N. General Assembly, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51 at 197, U.N. Doc. A/RES/39/708 (1984), entered into force as to the United States Nov. 20, 1994, signed Apr. 18, 1988.

pus available to all persons "in custody in violation of the Constitution or laws or treaties of the United States," and under the Constitution. 28 U.S.C. § 2241(c)(3); *Heikkila v. Barber*, 345 U.S. 229, 234-35 (1953); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). The writ of habeas corpus historically provides a remedy to non-citizens challenging executive detention. *INS v. St. Cyr*, 533 U.S. 289, 301-03 (2001).

**[1]** 2. Neither the REAL ID Act (8 U.S.C. § 1252(a)(4)) nor FARRA (8 U.S.C. § 1231 note) repeals all federal habeas jurisdiction over Trinidad y Garcia's claims, as the government asserts. A statute must contain "a particularly clear statement" before it can be construed as intending to repeal habeas jurisdiction. *Demore v. Kim*, 538 U.S. 510, 517 (2003). Even if a sufficiently clear statement exists, courts must determine whether "an alternative interpretation of the statute is 'fairly possible' " before concluding that the law actually repealed habeas relief. *St. Cyr*, 533 U.S. at 299-300 (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

**[2]** FARRA lacks sufficient clarity to survive the "particularly clear statement" requirement. *Saint Fort v. Ashcroft*, 329 F.3d 191, 200-02 (1st Cir. 2003); *Wang v. Ashcroft*, 320 F.3d 130, 140-42 (2d Cir. 2003). The REAL ID Act can be construed as being confined to addressing final orders of removal, without affecting federal habeas jurisdiction. *Nadarajah v. Gonzales*, 443 F.3d 1069, 1076 (9th Cir. 2006). Given a plausible alternative statutory construction, we cannot conclude that the REAL ID Act actually repealed the remedy of habeas corpus. *St. Cyr*, 533 U.S. at 299-300. The government also suggests that the rule of non-inquiry precludes the exercise of habeas jurisdiction. But the rule implicates only the *scope* of habeas review; it does not affect federal habeas *jurisdiction*.

**[3]** 3. The CAT and its implementing regulations are binding domestic law, which means that the Secretary of State *must* make a torture determination before surrendering an

extraditee who makes a CAT claim. FARRA and its regulations generate interests cognizable as liberty interests under the Due Process Clause, which guarantees that a person will not be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V; *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Goldberg v. Kelly*, 397 U.S. 254 (1970).

**[4]** 4. The process due here is that prescribed by the statute and implementing regulation: The Secretary must consider an extraditee's torture claim and find it not "more likely than not" that the extraditee will face torture before extradition can occur. 22 C.F.R. § 95.2. An extraditee thus possesses a narrow liberty interest: that the Secretary comply with her statutory and regulatory obligations.

5. The record before us provides no evidence that the Secretary has complied with the procedure in Trinidad y Garcia's case. The State Department has submitted a generic declaration outlining the basics of how extradition operates at the Department and acknowledging the Department's obligations under the aforementioned treaty, statute and regulations, but the Department gives no indication that it actually complied with those obligations in this case.

**[5]** Trinidad y Garcia's liberty interest under the federal statute and federal regulations entitles him to strict compliance by the Secretary of State with the procedure outlined in the regulations. He claims that the procedure has not been complied with, and the Constitution itself provides jurisdiction for Trinidad y Garcia to make this due process claim in federal court. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

**[6]** In the absence of any evidence that the Secretary has complied with the regulation, we lack sufficient basis in the record to review the district court's order granting Trinidad y Garcia's release. We remand to the district court so that the Secretary of State may augment the record by providing a

declaration that she has complied with her obligations. Counsel for the government represented that the Secretary would provide such a declaration if the court so instructs. We so instruct.

**[7]** 6. If the district court receives such a declaration, it shall determine whether it has been signed by the Secretary or a senior official properly designated by the Secretary. If so, the court's inquiry shall have reached its end and Trinidad y Garcia's liberty interest shall be fully vindicated. His substantive due process claim is foreclosed by *Munaf v. Geren*, 553 U.S. 674 (2008). The doctrine of separation of powers and the rule of non-inquiry block any inquiry into the substance of the Secretary's declaration. *Lopez-Smith v. Hood*, 121 F.3d 1322, 1326-27 (9th Cir. 1997). To the extent that we have previously implied greater judicial review of the substance of the Secretary's extradition decision other than compliance with her obligations under domestic law, *e.g.*, *Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1012 (9th Cir. 2000), we overrule that precedent.

7. The district court's order is vacated, and the case is remanded to the district court for proceedings consistent with this opinion.

**VACATED AND REMANDED.**

---

THOMAS, Circuit Judge, concurring, with whom WARDLAW, Circuit Judge, joins and BERZON, Circuit Judge, joins as to Part I:

I concur in the Per Curiam opinion. I write separately to express my views on jurisdiction and the scope of our habeas review.

# I

The district court had jurisdiction over Trinidad y Garcia's claims pursuant to 28 U.S.C. § 2241 and the Constitution of the United States.

## A

The district court had jurisdiction over the action pursuant to 28 U.S.C. § 2241(c)(3), which makes the writ of habeas corpus available to all persons "in custody in violation of the Constitution or laws or treaties of the United States." Federal habeas relief under § 2241 is available as a remedy to noncitizens challenging executive detention. *INS v. St. Cyr*, 533 U.S. 289, 301-03 (2001). Section 2241 also provides an avenue of relief to persons, such as Trinidad y Garcia, who are challenging the legality of extradition proceedings. *Barapind v. Reno*, 225 F.3d 1100, 1110 (9th Cir. 2000). Although habeas review may have been historically narrow in the extradition context, *see e.g. Fernandez v. Phillips*, 268 U.S. 311, 312 (1925), the Supreme Court has long recognized that "[t]here is no executive discretion to surrender [an individual] to a foreign government, unless that discretion is granted by law." *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 9 (1936). Trinidad claims that his extradition would be illegal under the Foreign Affairs Reform and Restructuring Act of 1998, 8 U.S.C. § 1231 note, and its implementing regulations, 22 C.F.R. §§ 95.2-.3. This claim is cognizable on habeas review.

### 1

The REAL-ID Act[1] does not repeal the habeas jurisdiction available to Trinidad y Garcia, as the government contends.[2]

---

[1]The REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, § 106, 119 Stat. 231, 310-11 (amending 8 U.S.C. § 1252).

[2]The relevant section is 8 U.S.C. § 1252(a)(4), which provides that:

"Notwithstanding any other provision of law (statutory or nonsta-

The jurisdiction-stripping provisions of the REAL-ID Act removed federal habeas jurisdiction over final orders of removal, in favor of direct petitions for review. *Nadarajah v. Gonzales*, 443 F.3d 1069, 1075 (9th Cir. 2006). But the REAL-ID Act's jurisdiction-stripping provisions do *not* remove federal habeas jurisdiction over petitions that do not directly challenge a final order of removal. *Id.* at 1075-76; *see also Flores-Torres v. Mukasey*, 548 F.3d 708, 711 (9th Cir. 2008); *Casas-Castrillon v. Department of Homeland Security*, 535 F.3d 942, 946 (9th Cir. 2008).

The purpose of the REAL-ID Act's jurisdiction-stripping provisions was to "consolidate judicial review of immigration proceedings into one action in the court of appeals." *St. Cyr*, 533 U.S. at 313 (internal quotation marks omitted) (discussing a related section). Indeed, "the entire section is focused on orders of removal." *Singh v. Gonzales*, 499 F.3d 969, 977 (2007). Uncodified sections of the REAL ID Act state that the legislation was intended to apply only to "final administrative order[s] of removal, deportation, or exclusion." 119 Stat. 231, 311 (quoted in notes to 8 U.S.C. § 1252). Simply put, the REAL ID Act's consolidation of judicial review of immigration matters has no effect on federal courts' habeas jurisdiction over claims made in the extradition context.

Trinidad y Garcia's habeas petition does not challenge a final order of removal; it challenges the legality of his extradition proceeding. Therefore, the REAL-ID Act does not divest federal courts of § 2241 habeas jurisdiction over his claims.

tutory) including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e) of this section."

2

Similarly, there is nothing in the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note), that repeals federal court habeas jurisdiction under § 2241, as the government also claims. FARRA provides, in relevant part, that:

> Notwithstanding any other provision of law, and except as provided in the regulations [the Secretary of State promulgates pursuant to the Act], no court shall have jurisdiction to review the regulations adopted to implement this section, and nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the [CAT] or this section, or any other determination made with respect to the application of the policy set forth in subsection (a), except as part of the review of a final order of removal pursuant to [8 U.S.C. § 1252].

FARRA § 2242(d) (codified at 8 U.S.C. § 1231 note).

There is nothing at all in this section that purports to repeal federal habeas jurisdiction under § 2241. Rather, the section simply states it is not conferring jurisdiction. We have already held that this provision does not divest federal courts of habeas jurisdiction. *Singh v. Ashcroft*, 351 F.3d 435, 440-42 (9th Cir. 2003). Our sister circuits agree. *Saint Fort v. Ashcroft*, 329 F.3d 191, 200-02 (1st Cir. 2003); *Wang v. Ashcroft*, 320 F.3d 130, 140-42 (2d Cir. 2003). This issue is settled, and there is no reason to revisit it.

3

Although, we need not resort to the special principles of statutory construction that apply to statutes purporting to

divest federal courts of habeas jurisdiction, I would be remiss if I did not underscore them. The elimination of all forms of judicial review of executive detention would violate the Constitution. *See Magana-Pizano v. INS,* 200 F.3d 603, 608-09 (9th Cir. 1999); U.S. Const. art. I, § 9, cl. 2. Given the constraints of the Suspension Clause, there is a strong presumption against construing statutes to repeal habeas jurisdiction. *St. Cyr*, 533 U.S. at 298; *Ramadan v. Gonzales*, 479 F.3d 646, 652 (9th Cir. 2007).

Indeed, the Supreme Court has required that (1) a statute contain "a particularly clear statement" before it can be construed as intending to repeal habeas jurisdiction, *Demore v. Kim*, 538 U.S. 510, 517 (2003) and (2) even if such a statement exists, courts are required to determine whether "an alternative interpretation of the statute is 'fairly possible' " before concluding that the law actually repealed habeas relief, *St. Cyr*, 533 U.S. at 299-300 (quoting *Crowell v. Benson,* 285 U.S. 22, 62 (1932)). Even if we were to credit the government's argument that the language of the REAL-ID Act and FARRA could be construed as an attempt to repeal habeas jurisdiction for the claims at issue, neither statute could satisfy the demanding standards of *St. Cyr*. FARRA lacks sufficient clarity to survive the "particularly clear statement" requirement. The construction of the REAL ID Act discussed earlier is more than sufficient to demonstrate that an alternate statutory interpretation is "fairly possible." Therefore, even if we were to credit the government's statutory construction (and I do not), it would not survive scrutiny under *St. Cyr*.

B

In addition to possessing jurisdiction under § 2241, the district court also had jurisdiction under the Constitution. Although the Constitution itself does not expressly grant federal habeas jurisdiction, it preserves the writ through the Suspension Clause.[3] *Boumediene v. Bush*, 553 U.S. 723, 743-46

---

[3]The Suspension Clause provides that: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2.

(2008); *Ex Parte Bollman*, 4 Cranch 75, 94-95, 2 L.Ed. 554 (1807). The Suspension Clause was designed to protect access to the writ of habeas corpus during those cycles of executive and legislative encroachment upon it. *Boumediene*, 553 U.S. at 745.

The "traditional Great Writ was largely a remedy against executive detention." *Swain v. Pressley*, 430 U.S. 372, 386 (1977) (Burger, C.J., concurring); *see also Darnel's Case*, 3 How. St. Tr. 1 (K.B. 1627). There have been numerous occasions in our history when Congress has limited statutory access to judicial relief in the immigration context. *See, e.g.*, The Immigration Act of 1917, 39 Stat. 874; the Immigration Act of 1907, 34 Stat. 898; the Immigration Act of 1891, 26 Stat. 1084; the Chinese Exclusion Act, 22 Stat. 58 (1882). However, the Supreme Court has repeatedly rebuffed arguments that these statutes foreclosed habeas corpus relief. *St. Cyr*, 533 U.S. at 304-08; *Heikkila v. Barber*, 345 U.S. 229, 234-35 (1953); *United States v. Jung Ah Lung*, 124 U.S. 621, 626-32 (1888).

Of particular significance is *Heikkila*. In considering the Immigration Act of 1917, the Supreme Court wrote in *Heikkila* that the Act "clearly had the effect of precluding judicial intervention in deportation cases except insofar as it was required by the Constitution." 345 U.S. at 234-35. After concluding an alien's rights were not enlarged by enactment of the Administrative Procedure Act, the court acknowledged the role of habeas corpus relief, noting that: "Now, as before, he may attack a deportation order only by habeas corpus." *Id.* at 235. Thus, even under legislation which intended to restrict all judicial review except as constitutionally required, the remedy of habeas corpus remained.

Thus, even if we adopted the government's position that Congress foreclosed Trinidad y Garcia's statutory habeas remedies, his resort to federal habeas corpus relief to chal-

lenge the legality of his detention would be preserved under the Constitution.

## II

Having concluded that the district court had jurisdiction, the question then becomes the scope of habeas relief available to Trinidad y Garcia. Once a federal court has completed its extradition determinations under 18 U.S.C. § 3184, the Secretary of State in her discretion may determine whether the alien should be surrendered to the custody of the requesting state. *Barapind*, 225 F.3d at 1105. We have long held that it is the Secretary's role, not the courts', to determine "whether extradition should be denied on humanitarian grounds or on account of the treatment that the fugitive is likely to receive upon his return to the requesting state." *Prasoprat v. Benov,* 421 F.3d 1009, 1016 (9th Cir. 2005); *see also United States v. Smyth,* 61 F.3d 711, 714 (9th Cir. 1995).

However, certain aspects of the Secretary's decision are reviewable. *Barapind*, 225 F.3d at 1106. The Convention Against Torture (CAT), as implemented by FARRA and State Department regulations, is binding domestic law. *Id.* Before finalizing an extradition order, the Secretary of State has a clear and nondiscretionary duty pursuant to the implementing regulations to consider whether a person facing extradition from the U.S. "is more likely than not" to be tortured in the State requesting extradition when determining whether to surrender a fugitive to a foreign country by means of extradition. 22 C.F.R. § 95.2.

In assessing whether the Secretary has complied with her statutory and regulatory obligations, our review differs from the ordinary analysis that we apply to petitions for review of decisions on CAT claims by the Board of Immigration Appeals. Immigrations judges and the BIA are charged with deciding CAT claims on the evidence presented. *See e.g.*, *Nuru v. Gonzales,* 404 F.3d 1207, 1217 (9th Cir. 2005).

Therefore, in reviewing BIA decisions, we have a developed administrative record before us.

Our role in reviewing the Secretary's extradition determinations is far different because the surrender of a person to a foreign government is within the Executive's powers to conduct foreign affairs and the Executive is "well situated to consider sensitive foreign policy issues." *Munaf v. Geren*, 553 U.S. 674, 702 (2007). For example, the Secretary's extradition determination is not confined to matters of public record. She may make confidential diplomatic inquiries and receive confidential diplomatic assurances about the treatment of an extraditee. The Judiciary is "not suited to second-guess such determinations" because the Executive "possess[es] significant diplomatic tools and leverage the judiciary lacks." *Id.* Therefore, the proper separation of powers among the branches prevents us from inquiring into the merits of the Secretary's extradition decision.

Although we cannot review the merits of the Secretary's internal extradition review, the Secretary's legal obligation to comply with the CAT, as implemented by FARRA and accompanying State Department regulations, is not a part of that review process. The Secretary could not, for example, refuse to conduct the review. Therefore, the scope of habeas review allows courts to examine whether the Secretary has complied with her non-discretionary obligations. This limited review process of simply determining that the Secretary has complied with the law is the least intrusive method of maintaining the delicate balance between the competing concerns of respecting executive prerogative in foreign relations and ensuring that the law has been followed.

The appropriate manner of review, and the one endorsed by the government at oral argument, is to require submission to the court of a certification or affidavit from the Secretary or her authorized designee certifying compliance with the non-discretionary obligations imposed by statute and regulation.

Once the district court determines that the Secretary has complied with her legal obligations, its review ends. Any further inquiry into the executive branch's internal extradition review process would exceed our proper role under the Separation of Powers doctrine.

## III

In this case, there is nothing in the record to indicate that the Secretary has fulfilled her non-discretionary obligations. The Johnson Declaration, which is the only evidence tendered by the government to the district court, only describes general procedures commonly used by the Department of State in extradition review. And it was executed before the Secretary made her determination, so it cannot form the basis for concluding that the Secretary has complied with her obligations in this case.

The government suggested in briefing that the Secretary's signature on the surrender warrant itself should be considered as proof of her determination that Trinidad y Garcia is not likely to be tortured. But the surrender warrant is not in the record. And we cannot rely on a purported admission by Trinidad y Garcia's counsel that the warrant was issued. That statement was solely based on an oral conversation with a State Department official. Thus, we are placed in the unusual position of reviewing a final agency decision that is not even part of the record.

Trinidad y Garcia has alleged in his habeas petition that the Secretary has not complied with FARRA's implementing regulations and violated his right to due process. In the absence of any evidence that the Secretary has complied with the regulation, we lack sufficient basis in the record to review the district court's order granting Trinidad y Garcia's release. Therefore, the appropriate remedy is to vacate the district court order and remand the case to the district court with directions that the government may be afforded the opportu-

nity to supplement the record with an appropriate declaration that the Secretary has complied with her non-discretionary statutory and regulatory duties.

---

TALLMAN, Circuit Judge, with whom Circuit Judges Clifton, M. Smith, and Ikuta join, dissenting:

Hedelito Trinidad y Garcia, a Philippine national, stands accused by the Philippines of kidnaping for ransom. After Philippine authorities requested his extradition so that he might stand trial there for his crime—a request reviewed and approved by the Departments of State and Justice—he was arrested in Los Angeles. Five years later, after his claims were denied by two different courts, then Secretary of State Condoleeza Rice ordered Trinidad extradited.

We went en banc to address a relatively straightforward legal question: whether an extraditee like Trinidad may challenge the Secretary of State's decision to extradite him based on the conditions he expects to face upon return to the requesting country. Like the Supreme Court, I believe the answer to be equally straightforward: no. I am not alone. A majority of us agree that the Rule of Non-Inquiry applies and precludes Trinidad from obtaining judicial review of the substance of the Secretary's decision. And, to the extent we have previously provided for greater review or relief, *e.g.*, *Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1012 (9th Cir. 2000), "we overrule that precedent." *Per Curiam* at 6402. Unfortunately, that is where our agreement ends.

Seizing on a concession the United States offered only for future cases and only if we found it legally necessary, some of my colleagues now find reason to doubt the undoubtable, worrying whether the Secretary ever made a torture determination at all. *See id.* at 6414-15. They brush aside the fact that Trinidad himself had no reason to doubt the reality of the Sec-

retary's decision—the decision that prompted Trinidad to bring his habeas claim, the district court to rule on it, the government to appeal, and two separate panels of this court to consider the matter—recharacterizing his disagreement with *the outcome of her decision* as a dispute over the process she employed. *Id.* Worse, they ignore a litany of firmly established legal principles—not the least of which being our presumption that constitutional officers properly discharge their legal duties—to achieve an unfathomable end and further delay an extradition that has already lumbered along for close to a decade.

I cannot question so lightly the honor of the Secretary or depart so readily from governing case law. The Secretary has made her decision, and neither the Convention Against Torture ("Convention"), the Foreign Affairs Reform and Restructuring Act of 1998 ("FARR Act"),[1] nor the controlling regulations, 22 C.F.R. §§ 95.1-95.4, give us cause to inquire further. The Rule of Non-Inquiry squarely applies, and our inquiry is at an end. As the Supreme Court directed in *Munaf v. Geren*, 553 U.S. 674, 692 (2008), there is nothing left for us to do but order Trinidad's habeas petition promptly dismissed so that he may finally be extradited, and I dissent to the extent we conclude any differently.

# I

Though I write predominately to explain in full detail why remand is so utterly unnecessary, I also believe we do the en banc process and the litigants a disservice by not more fully explaining why the Rule of Non-Inquiry precludes us from according Trinidad relief and why neither the FARR Act nor 8 U.S.C. § 1252(a)(4) deprives us of jurisdiction. I therefore

---

[1]Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681-761, 2681-822-23 (codified as a note to 8 U.S.C. § 1231). To the extent it is relevant to the questions of our jurisdiction and the merits of Trinidad's habeas claim, the Act is set forth in greater detail *infra* at pages 6430-31.

address not only the reason for my dissent, but also explain my understanding of the law undergirding those issues on which we agree. Furthermore, I endeavor to correct the liberties some of my concurring colleagues have taken with both the law and the record.

## A

Trinidad raises two distinct rationales for why he may not be extradited. First, he contends that he may "invoke the writ to challenge the Secretary's decision to surrender him in violation of his substantive due process right to be free from torture" at the hands of a foreign government. **Gov't Brief at 65.** He argues that the Supreme Court has yet to address "whether handing over an individual to a country where he would face the prospect of torture violates substantive due process," but has intimated that it might. **Id. at 67.** Alternatively, he asserts that even in the absence of a constitutionally protected interest to be free from the specter of foreign torture, he possesses a statutory right under the Convention and the FARR Act that precludes the United States from extraditing him to a country where torture is "more likely than not" to occur. *Cf.* § 95.2. He argues that these provisions confer a non-discretionary, mandatory obligation upon the Executive to decline to extradite him without first demonstrating to a court's satisfaction that it is not "more likely than not" that he will face torture there.

Trinidad's first claim is readily dispatched. Contrary to his suggestion, he is not the first to raise such a claim; nor would he be the first to have that claim denied. *E.g.*, *Neely v. Henkel*, 180 U.S. 109, 123, 125 (1901) ("The court below having found that there was probable cause to believe the appellant guilty of the offenses charged, the order for his extradition was proper, and no ground existed for his discharge on habeas corpus."); *Lopez-Smith v. Hood*, 121 F.3d 1322, 1325-26 (9th Cir. 1997). Long ago, the Court established that extraditees may not oppose their extraditions on the ground that the law

of the receiving country does not provide them the full pano-
ply of rights guaranteed them by the Constitution of the
United States. *Munaf*, 553 U.S. at 696-97 (discussing *Neely*).

In *Neely*, for example, the Court concluded that though the
Constitution guarantees an individual a broad range of "rights,
privileges, and immunities" against the United States govern-
ment, including the right to be free from torture, *Baze v. Rees*,
553 U.S. 35, 48 (2008) (plurality opinion), those provisions
had no effect "against the laws of a foreign country." 180 U.S.
at 122-23 ("Allusion is here made to the provisions of the
Federal Constitution relating to the writ of habeas corpus,
bills of attainder, *ex post facto* laws, trial by jury for crimes,
and generally to the fundamental guaranties of life, liberty,
and property embodied in that instrument. The answer to this
suggestion is that those provisions have no relation to crimes
committed without the jurisdiction of the United States
against the laws of a foreign country."). As recently explained
in *Munaf*, the Court "summarily rejected this claim" because
"Neely alleged no claim for which a 'discharge on *habeas
corpus*' could issue." 553 U.S. at 696 (quoting *Neely*, 180
U.S. at 125).

> [C]itizenship does not give him an immunity to com-
> mit crime in other countries, nor entitle him to
> demand, of right, a trial in any other mode than that
> allowed to its own people by the country whose laws
> he has violated and from whose justice he has fled.
> *When an American citizen commits a crime in a for-
> eign country, he cannot complain if required to sub-
> mit to such modes of trial and to such punishment as
> the laws of that country may prescribe for its own
> people*, unless a different mode be provided for by
> treaty stipulations between that country and the
> United States.

*Neely*, 180 U.S. at 123 (emphasis added); *accord Munaf*, 553
U.S. at 695. " '[T]he same principles of comity and respect

for foreign sovereigns that preclude judicial scrutiny of foreign convictions necessarily render invalid attempts to shield citizens from foreign prosecution in order to preempt such nonreviewable adjudications.' " *Munaf*, 553 U.S. at 698-99 (citation omitted).

Trinidad's second claim is not so easily resolved, however. As the Court recognized in *Valentine*, the Executive does not possess plenary power to extradite. *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 8-9 (1936) ("[T]he Constitution creates no Executive prerogative to dispose of the liberty of the individual."). Accordingly, extradition proceedings "must be authorized by law" and comport with pertinent statutory limits.[2] *Id.* at 9 ("There is no executive discretion to surrender him to a foreign government, unless that discretion is granted by law."); *accord Munaf*, 553 U.S. at 704 (quoting *Valentine*, 299 U.S. at 8-9). Thus, Trinidad is correct insofar as he argues that we must determine whether any of the pertinent statutory limits on which he relies actually limit Executive authority under the relevant treaty.[3]

(Text continued on page 6417)

---

[2]Congress has authorized the Executive to extradite individuals who have committed crimes in foreign countries pursuant to specific treaties. *See* 18 U.S.C. §§ 3181(a), 3184, 3186. Here, Trinidad is being extradited pursuant to the United States' Extradition Treaty with the Philippines, U.S.-Phil., art. VII, Nov. 13, 1994, S. Treaty Doc. No. 104-16, 1994 WL 855110.

[3]Chief Judge Kozinski argues that we lack *jurisdiction* over Trinidad's claim based on his cabining of Trinidad's claim as strictly statutory or regulatory. *E.g.*, *Kozinski Partial Dissent* at 6496-97. He distinguishes my reliance on *Valentine* based on his contention that "the *Valentine* extraditees' challenge fell squarely within the second traditional category of habeas review of extradition . . . : whether the executive branch was operating under a valid treaty authorizing the extradition in question." *Id.* at 6501-02. In short, he contends that treaty-based claims are cognizable under habeas, but statutory claims are not. I must disagree.

First, as a general matter, my respected colleague fails to adequately account for a baseline principle: "In the extradition context, when a 'fugitive criminal' is found within the United States, ' "there is no authority

vested in any department of the government to seize [him] and surrender him to a foreign power," ' in the absence of a pertinent constitutional or legislative provision." *Munaf*, 553 U.S. at 704 (alteration in original) (quoting *Valentine*, 299 U.S. at 8-9). Accordingly, when an individual claims, as Trinidad does, that his extradition is precluded by the terms of a statute or regulations, he necessarily claims that the Executive has acted in excess of its Article II authority—irrefutably a *constitutional* question. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (finding that a question as to whether the Executive acted in excess of its inherent or delegated power presented a question of "constitutional validity").

Moreover, *Valentine* itself does not support the narrow line my colleague draws. There, "[b]y the writs of habeas corpus," extraditees challenged the Executive's decision to extradite them to France. 299 U.S. at 6. Their argument was simple: "the President had no constitutional *authority* to surrender the[m] to the French Republic." *Id.* (emphasis added). The Court agreed. It expressed no hesitation in *reviewing*, and ultimately granting, their claims under its habeas power. *Id.* at 18.

Admittedly, *Valentine* itself concerned treaty limitations. That was after all the claimed basis for the Executive's extradition authority *as to those extraditees*. *Id.* at 6 ("Respondents sued out writs of habeas corpus to prevent their extradition to France under the Treaty of 1939 (37 Stat. 1526)."). However, the Court made clear that its rationale was no less applicable to *statutory limitations*:

> There is no executive discretion to surrender him to a foreign government, unless that discretion is granted by law. It necessarily follows that as the legal authority does not exist save as it is given *by act of Congress or by the terms of a treaty*, it is not enough that *statute or treaty* does not deny the power to surrender. It must be found that *statute or treaty* confers the power.

*Id.* at 9 (emphasis added). As noted by the Court, "The question is not one of policy, but of *legal authority*." *Id.* at 6 (emphasis added). And there is no tenable justification for arguing that congressional statutes are less effective curbs on Executive extradition authority than treaties. The Court has made clear that the opposite is in fact true. *See Medellin v. Texas*, 552 U.S. 491, 505 (2008).

Finally, I wholeheartedly agree with my colleague that courts have traditionally rejected claims like Trinidad's that are based on the treatment an extraditee expects to receive in the receiving country. *Cf. Kozinski Par-*

Trinidad misjudges the effect of that inquiry, however. Even were we to agree that either the Convention, the FARR Act, or the regulations limit Executive authority, it does not necessarily follow that the scope of our habeas review would grow in kind. *See, e.g., Oteiza v. Jacobus*, 136 U.S. 330, 334 (1890) ("A writ of *habeas corpus* in a case of extradition cannot perform the office of a writ of error."). Rather, because the Rule of Non-Inquiry remains, these limits would only establish the concerns that *might* be cognizable on habeas review. *See id.*; *see also Munaf*, 553 U.S. at 693 ("The principle that a habeas court is 'not bound in every case' to issue the writ . . . follows from the precatory language of the habeas statute, and from its common-law origins."); *Neely*, 180 U.S. at 123. It is only when Congress pairs a limitation on the Secretary's extradition authority with an express invitation for judicial review that the Rule of Non-Inquiry retracts to permit that review. *See Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *Neely*, 180 U.S. at 123; *see also Munaf*, 553 U.S. at 702-03. *Compare* 18 U.S.C. § 3184[4] (statute authorizing

---

*tial Dissent* at 6496 (citing *Neely*, *Oteiza*, and *Fernandez*). As *Munaf* makes abundantly clear, however, we cannot confuse our opinion as to the merits of his claim with his initial entitlement to review. 553 U.S. at 691, 700 (concluding that "[t]he lower courts in *Munaf* erred in dismissing for want of jurisdiction," even though it ultimately concluded that the petitioners could not challenge their transfer based on their belief that their "transfer to Iraqi custody is likely to result in torture"). Even assuming that Trinidad is not ultimately entitled to relief based on the treatment he expects in the Philippines, we have jurisdiction to review his claim. *Id.*

[4]Section 3184 provides:

> Whenever there is a treaty or convention for extradition between the United States and any foreign government, or in cases arising under section 3181(b), any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign

extradition under specified conditions), *with Barapind v. Reno*, 225 F.3d 1100, 1105 n.4 (9th Cir. 2000) (noting the six extradition-related questions cognizable on habeas review). Three cases—*Neely*, *Oteiza*, and *Fernandez*—aptly demonstrate this point.

As *Neely* discusses, near the turn of the twentieth century, the statutory extradition framework was codified at § 5270 of the United States Revised Statutes of 1878—a precursor to the United States Code. As originally enacted, that statute placed little to no restriction on the Executive's extradition authority. It required only that there be "a treaty or convention for extradition between the government of the United States and [the] foreign government" and that the official authorizing extradition have jurisdiction over both the request and the person of the accused. *Neely*, 180 U.S. at 110-11 (emphasis omitted) (quoting § 5270); *accord Oteiza*, 136 U.S. at 334. If these conditions were met, Congress left to the extraditing official the decision whether "the evidence [was] sufficient to

---

government any of the crimes provided for by such treaty or convention, or provided for under section 3181(b), issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered. Such complaint may be filed before and such warrant may be issued by a judge or magistrate judge of the United States District Court for the District of Columbia if the whereabouts within the United States of the person charged are not known or, if there is reason to believe the person will shortly enter the United States. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

sustain the charge under the provisions of the treaty." *Oteiza*, 136 U.S. at 334. Accordingly, in *Oteiza* the Court summarized the habeas jurisdiction of reviewing courts as follows:

> If the commissioner has jurisdiction of the subject-matter and of the person of the accused, and the offense charged is within the terms of a treaty of extradition, and the commissioner, in arriving at a decision to hold the accused has before him competent legal evidence on which to exercise his judgment as to whether the facts are sufficient to establish the criminality of the accused for the purposes of extradition, *such decision of the commissioner cannot be reviewed by a circuit court or by this court, on* habeas corpus, *either originally or by appeal*.

*Id.* (emphasis added). In short, habeas review extended no further than the explicit terms of judicial review authorized by the statute. Even though the statute limited the Executive's authority, the statute did not explicitly authorize review of the Executive's decision and thus the Court declined to second-guess the commissioner's self-professed adherence. *See id.*; *accord Munaf*, 553 U.S. at 702.

Notably, however, the scope of what was cognizable on habeas review began to expand in 1900 when Congress amended § 5270 to require, among other things, a judicial determination of probable cause before the Executive could lawfully extradite.[5] *Neely*, 180 U.S. at 111. Thus, in the post-amendment case of *Fernandez*, the Court concluded that the writ extended to "whether the magistrate had jurisdiction,

---

[5]Specifically, Congress amended § 5270 to add the following: "That such proceedings shall be had before a judge of the courts of the United States only, who shall hold such person on evidence establishing probable cause that he is guilty of the offense charged." Act of June 6, 1900, ch. 793, 31 Stat. 656, 657.

whether the offense charged is within the treaty *and*, by a somewhat liberal extension, *whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.*" 268 U.S. at 312 (emphasis added). And, unlike in *Oteiza*, the *Fernandez* Court delved into the facts to make an independent legal determination of probable cause, *id.* at 313-14 ("We are of opinion that probable cause to believe the defendant guilty was shown by competent evidence and that the judgment remanding the appellant must be affirmed."), as required by the amendment to § 5270—an inquiry we still undertake today.

In sum, what these cases demonstrate is that the scope of our habeas review in the extradition context wholly depends on the will of Congress. The judiciary participates in the extradition process only by congressional invitation, *Neely*, 180 U.S. at 123, and thus our power extends no further than the bounds of that invitation. *See Munaf*, 553 U.S. at 702-03; *Oteiza*, 136 U.S. at 334. When, as under the 1890 form of § 5270, Congress prefers that the courts play a minimal role, our review is just that, minimal. As *Oteiza* demonstrates, it may be as minute as deciding whether jurisdiction and an authorizing treaty exist, 136 U.S. at 334—questions on which Trinidad has already received all the habeas review to which he is entitled. However, as the contrast between *Oteiza* and *Fernandez* demonstrates, when Congress requires that we play a greater role, the Rule's "hands-off" practice is abrogated to the extent Congress directs.[6]

We must therefore evaluate the Convention, the FARR Act, and the regulations to ascertain whether, as it did when it amended § 5270 in 1900, Congress has extended a broader

---

[6]It is worthwhile to note that it is because of this reality that my colleagues' reliance on our immigration case law is unavailing. *E.g.*, *Pregerson Concurrence* at 6491; *Berzon Concurrence* at 6459-60. Unlike in the extradition context, Congress has expressly provided for judicial review of final orders of removal. *E.g.*, 8 U.S.C. § 1252.

invitation. We must first consider whether any of these provisions actually binds the Executive's statutory authority. Moreover, as *Oteiza* demonstrates, even if any of these provisions actually limits Executive authority, we must further determine whether Congress intended for the judiciary to have a role in evaluating the Executive's compliance.[7] *Id.* (concluding that

---

[7]Notwithstanding my discussion of *Oteiza*, *Fernandez*, and *Neely*, Judge Berzon erroneously argues that I rely on only the Court's earliest Rule of Non-Inquiry jurisprudence to conclude "that judicial review in *all* extradition cases is limited to . . . a narrowly circumscribed examination of a magistrate's finding of extraditability and of the magistrate's jurisdiction to enter such a finding." *Berzon Concurrence* at 6466-67. That is not true. I reiterate: *the entirety* of the Court's Rule jurisprudence demonstrate that the scope of our review is not frozen in its 1890's form, but rather ebbs and flows at Congress' direction.

Frankly, it is Judge Berzon who attempts to avoid the clear import of *all* of the Court's direction by artificially splitting the Court's Rule jurisprudence into two allegedly "competing" strands. *Id.* at 6466-67. This strawman allows her to ignore the clear import of the Court's earlier case law—case law that firmly rebuts her position—and thus disregard historic Rule principles. As *Neely* demonstrates, however, no actual distinction exists. 180 U.S. at 109-10 (relying upon the statute at issue in both *Oteiza* and *Fernandez* to support its conclusion). Just like *Oteiza* and *Fernandez*, *Neely* refused to extend judicial review in extradition cases, regardless of the nature of the perceived violation, absent specific direction from Congress. *See id.* at 109-10, 123 (noting the progression of § 5270 and considering that progression's effect on the scope of its habeas review).

Moreover, in critiquing my steadfast adherence to that reality, *Berzon Concurrence* at 6471-72, Judge Berzon compares apples to oranges when she equates judicial review of a specific extradition order with the judiciary's longstanding power to review acts of Congress. *Compare Marbury v. Madison*, 5 U.S. 137 (1803), *with Oteiza*, 136 U.S. at 334 (concluding in 1890 that the "decision of the commissioner cannot be reviewed by a circuit court or by this court, on habeas corpus, either originally or by appeal" if, among other things, "the offense charged is within the terms of a treaty of extradition"). She disregards the fact that the Supreme Court has itself distinguished the judiciary's power to review the broad question of Executive authority to extradite from a more myopic inquiry into the merits of the decision itself. *Compare Berzon Concurrence* at 6471-72, *with Oteiza*, 136 U.S. at 334-35 ("A writ of habeas corpus in a case of extradition cannot perform the office of a writ of error. . . . 'We are not sitting in this court on the trial of the prisoner, with power to pronounce him guilty and punish him, or declare him innocent and acquit him.' " (citation omitted)).

habeas review did not extend to permit review of the Executive's determination that it was in compliance with § 5270's requirement that "the evidence [was] sufficient to sustain the charge under the provisions of the treaty"); *see Benson v. McMahon*, 127 U.S. 457, 460-63 (1888) (noting the limits of § 5270 and the relevant treaty). Before we may address either of these questions, however, we must consider the threshold matter of our jurisdiction.

## 1

The government contends that two different statutory provisions negatively affect our jurisdiction over Trinidad's claim: subsection (d) of the FARR Act and 8 U.S.C. § 1252(a)(4)(d). We must determine whether either overcomes the lofty standards for precluding habeas jurisdiction established by the Court in *INS v. St. Cyr*, 533 U.S. 289 (2001).

Courts are not to conclude lightly that a statute precludes habeas review. Rather, the Supreme Court has directed that two principles must be considered:

"First, as a general matter, when a particular interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." *St. Cyr*, 533 U.S. at 299. "[W]here a provision precluding review is claimed to bar habeas review, the Court has required a particularly clear statement that such is Congress' intent." *Demore v. Kim*, 538 U.S. 510, 517 (2003) (noting that the Court held in *St. Cyr*, 533 U.S. at 308-09, that a provision titled " 'Elimination of Custody Review by Habeas Corpus,' along with broad statement of intent to preclude review, was not sufficient to bar review of habeas corpus petitions"); *St. Cyr*, 533 U.S. at 298 (citing cases refusing to bar habeas review where there was no specific mention of the Court's authority to hear habeas petitions); *id.* at 327 (Scalia, J., dissenting) (arguing that the majority "fabricates a superclear

statement, 'magic words' requirement for the congressional expression of" an intent to preclude habeas review).

Second, even if a sufficiently clear statement exists, courts must evaluate whether "an alternative interpretation of the statute is 'fairly possible.' " *St. Cyr*, 533 U.S. at 299-300 ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' *see Crowell v. Benson*, 285 U.S. 22, 62 (1932), we are obligated to construe the statute to avoid such problems."). If so, courts are instructed to effectuate that interpretation rather than the constitutionally suspect alternative. *Id.* at 299-300, 300 n.12 (" 'As was stated in *Hooper v. California*, 155 U.S. 648, 657 (1895), "[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality. . . ." The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it.' " (first alteration in original) (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988))).

As concluded by the First and Second Circuits, the FARR Act fails to overcome even the first of *St. Cyr*'s concerns, sufficient clarity. *Saint Fort v. Ashcroft*, 329 F.3d 191, 200-02 (1st Cir. 2003) (concluding that the FARR Act does not preclude habeas jurisdiction, at least in the immigration context); *Wang v. Ashcroft*, 320 F.3d 130, 140-42 (2d Cir. 2003) (same). *But see Mironescu v. Costner*, 480 F.3d 664, 674 (4th Cir. 2007).[8] Primarily, the pertinent provision, § 2242(d),[9]

---

[8]Because the Fourth Circuit explicitly disclaimed any consideration of the Suspension Clause's effect, *Mironescu*, 480 F.3d at 677 n.15 ("We also note that Mironescu does not argue that denying him the opportunity to present his CAT and FARR Act claims on habeas review violates the Suspension Clause. We therefore do not address that issue."), its rationale is of limited persuasive value to my resolution of Trinidad's more thoroughly argued claim. To be clear, though, I agree with Chief Judge Kozinski's summation that, for all intents and purposes, our ruling as to jurisdiction in this context creates a circuit split.

[9]For the full text of § 2242(d), see *infra* pages 6427-28.

speaks only in terms of review, not habeas. This alone appears dispositive. *Demore*, 538 U.S. at 517; *St. Cyr*, 533 U.S. at 298. *But see St. Cyr*, 533 U.S. at 327 (Scalia, J., dissenting) (arguing that specific mention of "habeas" is not required). Moreover, § 2242(d) can readily be interpreted as jurisdiction-neutral—neither providing nor precluding jurisdiction. It thus falls far short of the "particularly clear statement" necessary for us to conclude that Congress intended to bar habeas review. *Demore*, 538 U.S. at 517; *St. Cyr*, 533 U.S. at 298.

Section 1252(a)(4) does not suffer from the same infirmity. It clearly demonstrates congressional intent to preclude habeas review of a broad category of claims when it declares:

> Notwithstanding any other provision of law (statutory or nonstatutory) *including section 2241 of Title 28, or any other habeas corpus provision*, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be *the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment*, except as provided in subsection (e) of this section.

§ 1252(a)(4) (emphasis added). It easily hurdles the first of *St. Cyr*'s requirements, *see Demore*, 538 U.S. at 517; *St. Cyr*, 533 U.S. at 298, and gives us cause to consider *St. Cyr*'s second admonition—whether a "fairly possible" alternative interpretation exists that would allow us to avoid resolving the "difficult" constitutional question that might otherwise arise, i.e., whether relying on § 1252(a)(4) to preclude habeas review would be consistent with the Suspension Clause.[10] *See* 533

---

[10]As provided in Article I, Section 9, Clause 2, of the United States Constitution, "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

U.S. at 299-300, 301 n.13 ("The fact that this Court would be required to answer the difficult question of what the Suspension Clause protects is in and of itself a reason to avoid answering the constitutional questions that would be raised by concluding that review was barred entirely.").

In resolving the threshold element of this second admonition, whether a difficult Suspension Clause question in fact exists, *see id.* at 300-01, we must consider the historical scope of the writ. Fortunately, the Court has already done much of the heavy lifting. In *St. Cyr*, the Court considered whether § 1252(a)(2)(C) (2000)[11] precluded courts from considering even "a pure question of law"—whether an alien was entitled to relief under "[s]ection 212 of the Immigration and Nationality Act of 1952." *Id.* at 295, 298, 300. After noting that the Suspension Clause, at a minimum, protects the writ as it existed in 1789, the Court wasted little time in concluding that the writ had historically reached such questions:

> In England prior to 1789, in the Colonies, and in this Nation during the formative years of our Government, the writ of habeas corpus was available to non-enemy aliens as well as to citizens. It enabled them to challenge Executive and private detention in civil

---

[11]The form of the statute at issue in *St. Cyr* provided:

> Notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title, or any offense covered by section 1227(a)(2)(A)(ii) of this title for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 1227(a)(2)(A)(I) of this title.

§ 1252(a)(2)(C) (2000). It has since been amended. Pub. L. No. 109-13, Div. B, § 106(a)(1)(A)(ii) (2005) (inserting "(statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D)" after "Notwithstanding any other provision of law").

cases as well as criminal. *Moreover, the issuance of the writ was not limited to challenges to the jurisdiction of the custodian, but encompassed detentions based on errors of law, including the erroneous application or interpretation of statutes.* It was used to command the discharge of seamen who had a statutory exemption from impressment into the British Navy, to emancipate slaves, and to obtain the freedom of apprentices and asylum inmates. Most important, for our purposes, those early cases contain no suggestion that habeas relief in cases involving Executive detention was only available for constitutional error.

*Id.* at 301-03 (emphasis added) (footnotes omitted). Moreover, the Court rejected the INS's argument that the character of the underlying relief—mandatory or discretionary—was relevant as to whether courts could traditionally entertain challenges to the *overarching legal question* of statutory eligibility. *Id.* at 307 ("Habeas courts also regularly answered questions of law that arose in the context of discretionary relief."). "Eligibility that was 'governed by specific statutory standards' provided 'a right to a ruling on an applicant's eligibility,' even though the actual granting of relief was 'not a matter of right under any circumstances, but rather is in all cases a matter of grace.' "**¹²** *Id.* at 307-08 (citation omitted).

---

**¹²**Courts have traditionally "recognized a distinction between eligibility for discretionary relief, on the one hand, and the favorable exercise of discretion, on the other hand." *St. Cyr*, 533 U.S. at 307. Whereas litigants were entitled to review of their purely legal challenges, they were not entitled to review of the ultimate decision as to whether to grant relief. *Id.* at 307-08 (noting the "strong tradition in habeas corpus law . . . that subjects the legally erroneous failure to exercise discretion, unlike a substantively unwise exercise of discretion, to inquiry on the writ" (quoting Gerald L. Neuman, *Jurisdiction and the Rule of Law after the 1996 Immigration Act*, 113 Harv. L. Rev. 1963, 1991 (2000))); *see id.* at 298 ("[St. Cyr] does not dispute any of the facts that establish his deportability or the conclusion that he is deportable. Nor does he contend that he would have any right

Given *St. Cyr*, I think it plain that Trinidad would historically have been entitled to habeas review of his claim to the extent he argues that the Convention or the FARR Act bind the authority of the Executive to extradite him—"a pure question of law." *See Munaf*, 553 U.S. at 691-93, 700 (discussing *Valentine*, 299 U.S. at 8-9). Thus, a serious constitutional question would arise were Congress to preclude our habeas review as to whether those statutory provisions actually curtailed Executive authority, unless some other forum or opportunity for review existed. *See St. Cyr*, 533 U.S. at 314 ("If it were clear that the question of law could be answered in another judicial forum, it might be permissible to accept the INS' reading of § 1252. But the absence of such a forum, coupled with the lack of a clear, unambiguous, and express statement of congressional intent to preclude judicial consideration on habeas of such an important question of law, strongly counsels against adopting a construction that would raise serious constitutional questions.").

In this case, there is no substitute. Absent habeas review, Trinidad would never receive any judicial review of his claim that his extradition would violate statutory limitations on the Executive's extradition authority. *See, e.g.*, *Valentine*, 299 U.S. at 18; *cf. Omar v. McHugh*, 646 F.3d 13, 19 (D.C. Cir. 2011), *as amended*.[13] The threshold element of St. Cyr's second admonishment is thus met—a serious constitutional ques-

to have an unfavorable exercise of the Attorney General's discretion reviewed in a judicial forum. Rather, he contests the Attorney General's conclusion that, as a matter of statutory interpretation, he is not eligible for discretionary relief."). Thus, Congress could likely preclude review of the Secretary's ultimate merits decision. *Id.* at 307-08; *see Oteiza*, 136 U.S. at 334.

[13]Like *Munaf*, *Omar* concerned transfer and not extradition, and thus did not need to account for the historical practice of permitting extraditees to challenge the legal authority of the Executive to extradite, *Munaf*, 553 U.S. at 704—the cause for our Suspension Clause concern.

tion would exist were we to determine that § 1252(a)(4) precludes review of Trinidad's legal claim.

Accordingly, we must consider whether an alternative interpretation is "fairly possible." *St. Cyr*, 533 U.S. at 299-300. Trinidad and amici urge us to conclude that one is; that § 1252(a)(4) should be interpreted as limiting habeas review only in the immigration context—a context in which individuals would be entitled to file a petition for review on their Convention claims and therefore would receive the modicum of process likely required to avoid a Suspension Clause issue. *See* H.R. Rep. No. 109-72, at 121 (2005), *reprinted in* 2005 U.S.C.C.A.N. 240, 299. I agree.

There are a number of indicators that Congress intended § 1252(a)(4) to be applicable only in the immigration context. Among other things, Congress enacted § 1252(a)(4) as part of the REAL ID Act, the effect of which we have considered limited to the immigration context. *See, e.g.*, *Singh v. Gonzales*, 499 F.3d 969, 978 (9th Cir. 2007) ("[B]oth §§ 1252(a)(5) and 1252(b)(9) apply only to those claims seeking judicial review of orders of removal."); *Puri v. Gonzales*, 464 F.3d 1038, 1041 (9th Cir. 2006) ("[T]he REAL ID Act's jurisdiction-stripping provisions . . . [do] not apply to [the] claim because [the] claim is not a direct challenge to an order of removal."). And, as the House Committee Report explicitly states, Congress did not intend to "preclude habeas review over challenges to detention that are independent of challenges to removal orders." H.R. Rep. No. 109-72, at 122, *reprinted in* 2005 U.S.C.C.A.N. 240, 300. The bill was intended to "eliminate habeas review only over challenges to removal orders." *Id.*; *accord* Pub. L. No. 109-13, Div. B, Title I, § 106(b), 119 Stat. 231, 311 (2005) (codified as a note to § 1252) (noting that the "amendments made by subsection (a) . . . shall apply to cases in which the final administrative order of removal, deportation, or exclusion was issued before, on, or after the date of the enactment of this division"). Finally, the section title itself, "Judicial review of orders of removal,"

and the subchapter title, "Immigration," only further reaffirm this cabining of the section's effect. *Cf. Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (citation and internal quotation marks omitted)).

In light of *St. Cyr*, and the factors discussed above, I would conclude that § 1252(a)(4) does not deprive us of habeas jurisdiction over Trinidad's claim because there is a "fairly possible" alternative interpretation—that § 1252(a)(4) applies only to those claims seeking judicial review of orders of removal.

## 2

Having concluded that we have habeas jurisdiction, I move to the first merits question: whether, as Trinidad contends, Congress actually intended to restrict the Executive's extradition authority via the Convention, the FARR Act, or the implementing regulations. To resolve that question, I consider each in turn.

## i

I do not dwell long on the Convention or its terms. Treaties "are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms." *Medellin*, 552 U.S. at 505 (citation and internal quotation marks omitted). The Convention satisfies neither condition.

The Senate expressly conditioned its ratification of the Convention on the fact that it was "not self-executing." 136 Cong. Rec. 36,198 (1990); *see also* 136 Cong. Rec. S17486-01 (daily ed. Oct. 27, 1990) (statement of Sen. Terry Sanford) (rendering the advice and consent of the Senate in ratifying the Convention subject to the declaration that "the provisions

of Articles 1 through 16 of the Convention are not self-executing"); S. Treaty Doc. No. 100-20, at 2 (1988). And, as I will explain shortly, the FARR Act did not implement the Convention in a manner that curtails the Secretary's authority to extradite. *See Munaf*, 553 U.S. at 703 n.6 ("[C]laims under the FARR Act may be limited to certain immigration proceedings."); *cf. Saint Fort*, 329 F.3d at 202 (concluding that the Act and regulations effectuated the Convention in the immigration context); *Wang*, 320 F.3d at 140 (same). The Convention therefore cannot affect the Executive's authority under § 3184 except to the extent directed by the relevant regulations.

### ii

The FARR Act requires greater scrutiny. In relevant detail, it provides:

> **(a) Policy**.—It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.

> **(b) Regulations**.—Not later than 120 days after the date of enactment of this Act [Oct. 21, 1998], the heads of the appropriate agencies shall prescribe regulations to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.

* * *

**(d) Review and construction**.—Notwithstanding any other provision of law, and except as provided in the regulations described in subsection (b), no court shall have jurisdiction to review the regulations adopted to implement this section, and nothing in this section [this note] shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section [this note], or any other determination made with respect to the application of the policy set forth in subsection (a), except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. 1252).

§ 2242.

Trinidad argues that subsection (a) is dispositive. He echoes the erroneous conclusion in *Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1012 (9th Cir. 2000)—a decision we expressly overrule today—in asserting that the FARR Act's articulation of "policy" confers a binding, non-discretionary obligation on the Secretary. That cannot be.[14]

(Text continued on page 6433)

---

[14]I think it important to dispel at the very outset of my FARR Act discussion the erroneous assertion made by some of my esteemed colleagues that my position is at odds with the government's. Two examples more than demonstrate my point. The first pertains to my colleague's representation that the government has emphatically asserted, *Berzon Concurrence* at 6454, that "the FARR Act thereby 'prohibits the extradition of a person who more likely than not will be tortured, and . . . creates a duty on the part of the Secretary of State to implement that prohibition,' " *Berzon Concurrence* at 6453 (citing the government's brief at pages 4 and 66). As the record makes clear, the government said no such thing. Rather, the government in fact stated:

Trinidad has contended that *Article 3 of the Torture Act* prohibits the extradition of a person who more likely than not will be tortured, and that the FARR Act creates a duty on the part of the Secretary of State to implement that prohibition. While these contentions are correct, neither of those instruments makes justi-

ciable the Secretary's surrender determination which is exclu-
sively within the province of the Secretary of State.

**Gov't Brief at 66** (emphasis added).

I fully agree with the government's *actual* position. Article 3 of the
Convention does indeed purport to prohibit the extradition of individuals
likely to be tortured. However, as explained, the Convention lacks the
force of domestic law. Accordingly, as the government contends, Con-
gress enacted the FARR Act to cause the "Secretary of State *to implement*
that prohibition." *Id.* Thus, as I explain in this section and the following,
we must turn to these regulations, and not to the Act, to ascertain the scope
of the obligations *actually* imposed.

The second example concerns a similar misrepresentation: that the State
Department has interpreted its own regulations as precluding it from "sur-
render[ing] a fugitive who more likely than not will be tortured, even if
foreign policy interests at the time would be served by an extradition."
*Berzon Concurrence* at 6459; *see also Pregerson Concurrence* at 6492.
The government never advanced such a position in its briefs. Again, one
need only turn to the actual text of the government's "interpretation" to
see that the government offered no interpretation at all. **Gov't Brief at 4.**
Instead, the government was simply explaining that its position fell within
the bounds of those matters *Munaf* held to be free from judicial second-
guessing, *cf. Munaf*, 553 U.S. at 702 ("[T]his is not a more extreme case
in which the Executive has determined that a detainee is likely to be tor-
tured but decides to transfer him anyway.")—as demonstrated by the fact
that the government thereafter cited *Munaf* for that very proposition. ***Id.***
**(quoting *Munaf*, 553 U.S. at 702).**

Perhaps more worrisome, though, is that the government's position
regarding *the import of the regulations* is wholly irrelevant to the point for
which Judge Berzon attempts to demand deference: *her* contention that *the
statute* itself implements the Convention or binds Executive authority. *Cf.
Berzon Concurrence* at 6458-59 (citing *Chase Bank USA, N.A. v. McCoy*,
131 S. Ct. 871, 880 (2011)). Quite simply, one has nothing to do with the
other. *Compare Schleining v. Thomas*, 642 F.3d 1242, 1246 (9th Cir.
2011) ("*Chevron* deference to an agency's interpretation of an ambiguous
statute applies only if the agency involved has formally interpreted the
statute or promulgated a rule based on an implicit interpretation of the stat-
ute."), *with* § 95.4 ("Decisions of the Secretary concerning surrender of
fugitives for extradition are *matters of executive discretion not subject to
judicial review*." (emphasis added)), and § 95.3(b) ("[T]he Secretary *may*

First and foremost, one cannot glean congressional intent from a single sentence of a statute. Rather, because "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000), it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). "[O]ur task is to fit, if possible, all parts into an harmonious whole." *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959); *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 18 (1981).[15]

The Court's example in *Pennhurst* is instructive. There, the Court considered whether Congress intended the "bill of rights" provision of 42 U.S.C. § 6010[16] to confer "substantive

---

decide to surrender the fugitive to the requesting State, to deny surrender of the fugitive, or to surrender the fugitive subject to conditions." (emphasis added)).

[15]Judge Berzon's attempts to distinguish *Pennhurst* are unpersuasive. As my discussion makes clear, I do not rely on the Court's explanation to argue in favor of some "superclear" words test. *But see Berzon Concurrence* at 6454-56. Rather, I cite *Pennhurst* as one example among many wherein the Court has cautioned us to interpret a statute as a whole rather than by focusing on a single piece or provision—a mundane and well-established principle of statutory interpretation that my concurring colleagues disregard. To be sure, neither explains the inherent conflict between § 2242(a) (stating "*the policy* of the United States" (emphasis added)) and § 2242(b) (directing the Secretary to prescribe regulations "*to implement* the obligations of the United States" (emphasis added)) under their interpretations of the Act.

[16]The language at issue in *Pennhurst* provided:

Congress makes the following findings respecting the *rights* of persons with developmental disabilities:

(1) Persons with developmental disabilities have a *right* to appropriate treatment, services, and habilitation for such disabilities.

rights" or to impose "an obligation on the States." 451 U.S. at 13, 15. Plaintiffs pointed out that the statute explicitly spoke in terms of "rights" and "obligations" and therefore could not be interpreted as conferring anything less. *Id*. at 18. The Court disagreed. It emphasized that courts cannot interpret a statute by relying solely on "a single sentence or member of a sentence," and that the seemingly clear provisions relied upon by the plaintiffs were rendered ambiguous by the context of the remainder of the Act. *Id*. at 18-19. Considering those other provisions, the Court concluded that § 6010 "does no more than express a congressional preference for certain kinds of treatment"—that it provides "simply a general statement of 'findings' " that "justifies and supports Congress' appropriation of money under the Act and *guides the Secretary* in his review of state applications for federal funds." *Id*. at 19 (emphasis added).

Thus, as *Pennhurst* demonstrates, even assuming that subsection (a) could be interpreted as Trinidad suggests, we must test that interpretation against the remainder of the Act. *Brown*, 529 U.S. at 132; *Mandel Bros.*, 359 U.S. at 389. Subsection (b) is particularly illuminating. Its directive that "the heads of the appropriate agencies prescribe regulations *to implement* the obligations of the United States under Article 3 of the United Nations Convention Against Torture," (emphasis added), conflicts with Trinidad's assertion that the FARR Act itself implements the Convention and binds Executive authority. *Cf. Alexander v. Sandoval*, 532 U.S. 275, 290

---

\* \* \*

(3) The Federal Government and the States both have an *obligation* to assure that public funds are not provided to any institutio[n] . . . that—(A) does not provide treatment, services, and habilitation which is appropriate to the needs of such person; or (B) does not meet the following minimum standards . . . .

451 U.S. at 13 (some alterations in original) (emphasis added).

(2001) ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.").

Congress did not direct the agency heads to *further* implement our obligations. Nor did Congress direct the agencies to promulgate regulations that conformed to or even considered the FARR Act. Rather, subsection (b) suggests that Congress intended the FARR Act to serve not as the implementing tool, but only as the mandate directing the promulgation of regulations that would implement the Convention. *Cf. id.* Rather than attempting to implement the Convention with a single broad stroke, Congress wisely delegated the task to those who could act with more surgical precision, crafting regulations that take into account the intricacies and specific history of their respective areas of expertise.[17]

Subsection (d) also supports this view of the Act. Here again, Congress focuses not on the Act's effect, but on the effect of the regulations. § 2242(d) (noting that the regulations will implement the obligations of the United States). In addition, as discussed, the provision is at best jurisdiction-neutral —neither providing nor barring jurisdiction. Congress specifically declined to provide a mechanism for "claims raised under the Convention" or the Act, "*except* as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. [§ ] 1252)." *Id.* (emphasis added). This absence is telling. *Cf. Sandoval*, 532 U.S. at 290. As the Court noted in *Munaf*, it suggests that Congress did not intend to impose an obligation on the Executive outside the removal context. 553 U.S. at 703 n.6 ("[C]laims under the FARR Act may be limited to certain immigration proceedings.");[18] *see* § 2242(c), (e) (relying on

---

[17]Accordingly, the Act is far from impotent. *Contra Berzon Concurrence* at 6456. It serves as an affirmative mandate to the "agency heads" imposing on them an obligation to enact appropriate regulations. § 2242(b).

[18]Given this clear statement by the Court, I am unable to understand how Judge Berzon can contend that "the Supreme Court . . . ha[s] taken

provisions of the Immigration and Nationality Act); *cf. Sandoval*, 532 U.S. at 289 ("Nor do the methods that § 602 goes on to provide for enforcing its authorized regulations manifest an intent to create a private remedy; if anything, they suggest the opposite.").

Subsection (a) does nothing to disturb this interpretation of the intended import of the Act. Similar to the statute at issue in Pennhurst, it "does no more than express a congressional preference for certain kinds of treatment" and provides "simply a general statement of 'findings' " that "justifies and supports Congress' " decision to instruct the agency heads to promulgate regulations "to implement" the Convention. *Compare* § 2242(a), *with* § 6010, *and Pennhurst*, 451 U.S. at 19. And, if any obligations were independently conferred, those obligations were confined to the immigration context. § 2242(b)-(e); *Munaf*, 553 U.S. at 703 n.6. Even analyzed in the abstract, Congress' framing of its statement in terms of "policy" undercuts Trinidad's assertion that it confers a binding obligation. *Pennhurst*, 451 U.S. at 19; *see Gonzaga Univ. v. Doe*, 536 U.S. 273, 288 (2002). Certainly, as used in general language, the term "policy" connotes a precatory rather

the view that the FARR ACT implements CAT" in the extradition context. *Berzon Concurrence* at 6458. The Court said precisely the opposite in *Munaf*.

Moreover, my colleague's reliance on *Medellin* is similarly misplaced. Even setting aside the fact that *Munaf* followed *Medellin* and thus controls, *Medellin* did not state that the FARR Act itself implemented the Convention as my colleague contends. 552 U.S. at 520. *But see Berzon Concurrence* at 6459-60 (citing *Medellin*, 552 U.S. at 520, for the proposition that "the FARR Act . . . exemplif[ies] a statute by which a treaty (CAT) had been given 'wholesale effect . . . through implementing legislation.' "). Rather, the Court actually stated only that the Act "direct[ed] the 'appropriate agencies' to 'prescribe regulations to implement the obligations of the United States under Article 3.' " *Medellin*, 552 U.S. at 520. Thus, just as I contend, it is only the regulations, and not the Act itself, that could have affected the authority and discretion otherwise delegated by Congress to the Executive.

than obligatory import. *Black's Law Dictionary* 1276 (9th ed. 2009) (defining policy as "general principles by which a government is guided in its management of public affairs"); *Merriam-Webster's Collegiate Dictionary* 960 (11th ed. 2008) ("a high-level overall plan embracing the general goals and acceptable procedures esp[ecially] of a governmental body"), *available at* http://www.merriam-webster.com/dictionary/policy.

Similarly, when used by Congress, it demonstrates concern for "aggregate" effect, not "whether the needs of any particular person have been satisfied." *Gonzaga*, 536 U.S. at 288 (quoting *Blessing v. Freestone*, 520 U.S. 329, 343-44 (1997) ("Far from creating an *individual* entitlement to services, the standard is simply a yardstick for the Secretary to measure the *systemwide* performance of a State's Title IV-D program.")). *Contra Berzon Concurrence* at 6456 (providing no support for its contrary interpretation). As the Court stated in *Pennhurst*, " 'Congress sometimes legislates by innuendo, *making declarations of policy* and indicating a preference while requiring measures that, though falling short of legislating its goals, serve as a nudge in the preferred directions.' " 451 U.S. at 19 (emphasis added) (quoting *Rosado v. Wyman*, 397 U.S. 397, 413 (1970)).

"This is such a case." *See id.* Subsection (a) "is too thin a reed to support the rights and obligations read into it by" Trinidad. *See id.* It only "fits" as part of a "harmonious whole" with the entirety of the Act, *cf. Mandel Bros.*, 359 U.S. at 389, if interpreted as a "nudge" by Congress indicating Congress' "preference" that when implementing the mandated regulations, the agency heads bear in mind the general policy of the United States "not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." *See Pennhurst*, 451 U.S. at 19. It does no more.

### iii

Finally, we reach those regulations promulgated to *implement* the obligations of the United States under the Convention: 22 C.F.R. §§ 95.1-95.4. Notably, not one could be interpreted as limiting Executive authority. To the contrary, each maintains the historical practice of leaving the ultimate extradition decision to the Executive's discretion:

> *Decisions of the Secretary concerning surrender of fugitives for extradition are matters of executive discretion not subject to judicial review.* Furthermore, pursuant to section 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998, P.L. 105-277, notwithstanding any other provision of law, no court shall have jurisdiction to review these regulations, and nothing in section 2242 shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or section 2242, or any other determination made with respect to the application of the policy set forth in section 2242(a), except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. 1252), which is not applicable to extradition proceedings.

§ 95.4 (emphasis added); *see also* § 95.3(b) ("[T]he Secretary *may* decide to surrender the fugitive to the requesting State, to deny surrender of the fugitive, or to surrender the fugitive subject to conditions." (emphasis added)).

\* \* \*

In sum, neither the Convention, the FARR Act, nor the implementing regulations alter the historically recognized discretion accorded to the Secretary by Congress to determine whether "to surrender [a] fugitive to the requesting State, to deny surrender of the fugitive, or to surrender the fugitive

subject to conditions." § 95.3(b); *see Munaf*, 553 U.S. at 702 (describing the Executive's discretion); *Lopez-Smith*, 121 F.3d at 1326 (same). As such, Trinidad has failed to even allege a claim for which relief may be granted, and, as the Court directed in *Munaf*, all that is left for us to do is order Trinidad's petition promptly dismissed. 553 U.S. at 692, 705.

**3**

Even were we to assume for the sake of argument that the Convention or the FARR Act confers a binding obligation on the Executive, that would still not aid Trinidad's cause. As the Court made clear in *Munaf*, that we have the power to grant habeas relief does not mean that we *must* or even *should* exercise that authority in every case. *Id.* at 691-93, 700 (instructing that "even where a habeas court has the power to issue the writ" it must question " 'whether this be a case in which [that power] ought to be exercised' " (alteration in original) (quoting *Ex parte Watkins*, 3 Pet. 193, 201 (1830) (Marshall, C.J.))); *id.* at 693 ("The principle that a habeas court is 'not bound in every case' to issue the writ follows from the precatory language of the habeas statute, and from its common-law origins." (citation omitted)); *accord Lopez-Smith*, 121 F.3d at 1326. Rather, we must consider whether " 'prudential concerns,' *Withrow v. Williams*, 507 U.S. 680, 686 (1993), such as comity and the orderly administration of criminal justice," require us " 'to forgo the exercise of [our] habeas corpus power,' *Francis v. Henderson*, 425 U.S. 536, 539 (1976)." *Munaf*, 553 U.S. at 693. And, as the Court's own precedent demonstrates, this Rule of Non-Inquiry acts with particular force in the extradition context. *Neely*, 180 U.S. at 123; *Oteiza*, 136 U.S. at 334; *see Lopez-Smith*, 121 F.3d at 1327 ("[G]enerally, under what is called the 'rule of non-inquiry' in extradition law, courts in this country refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be treated humanely."); *see also Munaf*, 553 U.S. at 693, 704.

Thus, in *Oteiza*, the Court declined to scrutinize the Executive's conclusion that it could extradite Oteiza to Cuba in conformity with the pertinent statutory framework because, while Congress had placed conditions on the Executive's authority to extradite, it had never directed the judiciary to review the Executive's conclusion that it had satisfied those conditions. 136 U.S. at 334 ("A writ of habeas corpus in a case of extradition cannot perform the office of a writ of error. . . . [T]he decision of the commissioner cannot be reviewed by a circuit court or by this court, on *habeas corpus*, either originally or by appeal."). Likewise, in *Neely*, the Court declined to delve into the conditions Neely expected to face upon refouler to Cuba or the circumstances under which he might be tried there because, again, Congress had not invited the court's participation. *See* 180 U.S. at 123.

Similarly, in *Munaf*, these same principles led the Court to flatly reject the petitioners' request that the Court review the Secretary of State's decision to transfer them to Iraqi custody. 553 U.S. at 702-03 (noting the "*policy* of the United States not to transfer an individual in circumstances where torture is likely to result" (emphasis added)). Instead of requiring the Secretary to turn over her files or justify her decision, the Court accepted the Solicitor General's explanation that "such determinations are based on 'the Executive's assessment of the foreign country's legal system and . . . the Executive['s] . . . ability to obtain foreign assurances it considers reliable,' " and readily concluded that the "Judiciary is not suited to second-guess such determinations—determinations that would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area." *Id.* at 702 (alterations in original) (citation omitted).

The Court noted that absent a specific congressional directive to the contrary, *see Neely*, 180 U.S. at 123; *Oteiza*, 136 U.S. at 334, we are to leave such delicate questions of diplomacy and foreign policy to those best suited to the task: the

political branches. *Munaf*, 553 U.S. at 701, 702-03 ("[T]he political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is. . . . '[W]e need not assume the political branches are oblivious to these concerns. Indeed, the other branches possess significant diplomatic tools and leverage the judiciary lacks.' " (citation omitted)). *See generally Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 417-18 (1964) ("To permit the validity of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations." (citation and internal quotation marks omitted)). Accordingly, the Court declined to review either the process or the substance of the Secretary's decision and concluded that the petition for habeas corpus should have been promptly dismissed. *Munaf*, 553 U.S. at 705 ("Habeas corpus does not require the United States to shelter such fugitives from the criminal justice system of the sovereign with authority to prosecute them.").

Notably, this historical reluctance to inquire into the merits of the Executive's decision in *this extradition context* countermands most of my colleagues' otherwise apt analysis as to why we traditionally would exercise our habeas power in other analogous situations. *Pregerson Concurrence* at 6487-89, 6492-94; *Berzon Concurrence* at 6496, 6470-72. It also explains why my colleagues' heavy reliance on *Boumediene v. Bush*, 553 U.S. 723 (2008), and wholesale discard of *Munaf* is particularly unpersuasive. *Cf., e.g.*, *Berzon Concurrence* at 6461 (asserting that "not only is there no applicable holding in *Munaf*; there is no applicable reasoning or implicit 'message' either"); *id.* at 6470-79 (relying on *Boumediene* to formulate its novel rule of limited inquiry).

To understand where my colleagues go astray, it is important to recognize an unequivocal truth: The opinions of my concurring colleagues *depend* on the complete inapplicability

of *Munaf*. If *Munaf* applies, their reasoning fails. And, contrary to their suggestion, *Munaf* cannot be so conveniently dismissed as "of little use here." *Berzon Concurrence* at 6464; *accord id.* at 6461 (claiming that "not only is there no applicable holding in *Munaf*; there is no applicable reasoning or implicit 'message' either"). First, *Munaf*'s general directive regarding the proper utilization of our habeas power was not restricted to any particular context. *Munaf*, 553 U.S. at 693-94. Rather, the Court spoke generally and thereafter relied on *Neely*, an extradition case, as illustrative of its point. *E.g.*, *id.* at 695-97. Also, nearly all of the Court's discussion of the Rule's history and application was premised on its prior application in *extradition cases*. *E.g.*, *id.* at 695-97 (discussing *Neely*); *id.* at 704 (discussing *Valentine*). Finally, *Munaf* itself discussed what other concerns might be implicated were *Munaf* an extradition case. *Id.* at 704-05. There is thus no credible reason for so entirely, and easily, disregarding *Munaf*'s guidance.

Moreover, in their attempt to invoke *Boumediene* to support their reasoning, my colleagues overlook three critical distinctions. The first is that *Boumediene* concerned the scope of the judiciary's habeas review in the *executive detention* context—a context in which the Rule of Non-Inquiry has never been applied. The Court therefore did not consider what effect the Rule might have on *Boumediene*'s rationale were it to be applied in the *extradition* context.

Second, my colleagues overlook the fact that the predominate concern underlying *Boumediene*'s conclusion, indefinite executive detention, is not implicated in the present context. *See id.* at 693. Rather than facing a circumstance in which "the consequence of error may be detention of persons for the duration of hostilities that may last a generation or more," *Boumediene*, 553 U.S. at 785, and thus "the need for collateral review is most pressing," *id.* at 783, we face a circumstance in which the consequence of error is in fact *release from exec-*

*utive detention*. As discussed in *Munaf*, this reality caused the Court to question whether habeas relief was even appropriate:

> Habeas is at its core a remedy for unlawful executive detention. *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion). The typical remedy for such detention is, of course, release. But here the last thing petitioners want is simple release; that would expose them to apprehension by Iraqi authorities for criminal prosecution—precisely what petitioners went to federal court to avoid. At the end of the day, what petitioners are really after *is a court order requiring the United States to shelter them from the sovereign government seeking to have them answer for alleged crimes committed within that sovereign's borders*.

*Munaf*, 553 U.S. at 693-94 (emphasis added) (citation omitted). Citing *Wilson v. Girard*, 354 U.S. 524 (1957), a transfer case, and *Neely*, an extradition case, the Court thereafter concluded: "as the foregoing cases make clear, habeas is not a means of compelling the United States to harbor fugitives from the criminal justice system of a sovereign with undoubted authority to prosecute them." *Munaf*, 553 U.S. at 695-97.

Finally, and perhaps most critically, my colleagues fail to account for the fact that *Boumediene* itself never held that habeas petitioners were entitled *to relief*. *See* 553 U.S. at 795. To the contrary, *Boumediene* held "only that [the] petitioners before us are entitled *to seek the writ*; that the DTA review procedures are an inadequate substitute for habeas corpus; and that petitioners in these cases need not exhaust the review procedures in the Court of Appeals before proceeding with their habeas actions in the District Court." *Id.* This conclusion is fundamentally no different from that in *Munaf*. There, in a decision delivered on the same day as *Boumediene*, the Court began its analysis by considering and rejecting the govern-

ment's contention that the petitioners were precluded from *seeking habeas relief. Munaf*, 553 U.S. at 668 ("'Under the foregoing circumstances,' we decline to extend our holding in *Hirota* to preclude American citizens held overseas by American soldiers subject to a United States chain of command *from filing habeas petitions*." (emphasis added)). As discussed, the Court thereafter made clear, however, that the simple fact that the courts "have the power to grant habeas relief does not mean that we *must* or even *should* exercise that authority in every case." *Supra* at 6439. Instead, citing the prudential concerns underlying the Rule of Non-Inquiry, the Court concluded that, though entitled to *seek* relief, *Munaf*, 553 U.S. at 668, the petitioners were not entitled to *obtain* relief, which negated any purpose for subjecting the Executive's decision to judicial review, *id.* at 692-94 ("We accordingly hold that the detainees' claims do not state grounds upon which habeas relief may be granted . . .").

   In sum then, the present case is no different from the litany of extradition cases that preceded it. Unlike the amended form of § 5270 or the current form of § 3184, the FARR Act in no way suggests that Congress invited, or even desired, the courts to take any part in the Secretary's ultimate decision. Rather, § 2242(d) specifically provides to the contrary—that "nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the application of the policy set forth in subsection (a), except as part of the review of a final order of removal." And the regulations promulgated "to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture" only further reinforce that intent. §§ 95.3(b), 95.4. Each simply maintain the historical status quo—the well-accepted understanding that Congress intends the ultimate extradition decision to be left to the Secretary's discretion. *See generally Lopez-Smith*, 121 F.3d at 1327 ("Once the certificate issues, the Secretary may exercise discretion whether to extradite an American national. The

Secretary's exercise of discretion need not be based upon considerations individual to the person facing extradition. It may be based on foreign policy considerations instead."). Accordingly, the Rule continues to apply to preclude our review.

**B**

Despite concluding that "[t]he doctrine of separation of powers and the rule of non-inquiry block any inquiry into the substance of the Secretary's declaration," *Per Curiam* at 6402, my colleagues decline to put this case to rest. They ignore the Court's concern for promptness, *Munaf*, 553 U.S. at 692, and reason that remand is necessary because the "record before us provides no evidence that the Secretary has complied" with her asserted obligation to "consider an extraditee's torture claim and find it not 'more likely than not' that the extraditee will face torture" if extradited, *Per Curiam* at 6401. In effect, my colleagues transform the Rule of Non-Inquiry into a rule of *some* inquiry or, as Judge Berzon would prefer, a more searching rule of "*limited*" inquiry, thereby laying the groundwork for a morass of procedural challenges and even more delay in the extradition. They selectively ignore the Rule's effect, and, without adequate explanation or support, subvert the clear import of the controlling regulations by imposing procedural conditions and proofs on the Secretary when both the regulations and the Rule clearly preclude just that—any inquiry. I will not willingly take part in such an unprecedented departure from either the facts in the record before us or our governing case law.

First, there is no dispute that former Secretary of State Rice made the determination to order Trinidad's extradition; rather, Trinidad himself admits as much. Second Petition for Writ of Habeas Corpus at 2 ¶¶ 2-9, No. 2:08-cv-07719-MMM (S.D. Cal. Sept. 17, 2008), ECF No. 1 ("[T]he Honorable Condoleeza Rice, Secretary of State, issued a surrender warrant for Trinidad. . . . Date of surrender warrant: September 12, 2008[.]"); Application for Order Staying Extradition at 3 ¶ 3,

No. 2:07-cv-06387-MMM (S.D. Cal. Sept. 16, 2008), ECF No. 45 (declaration of Craig Harbaugh, Trinidad's attorney, made under penalty of perjury, that the Secretary had made the decision to extradite Trinidad). These admissions are "conclusive in the case." *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 130 S. Ct. 2971, 2983 (2010) (quoting 2 K. Broun, *McCormick on Evidence* § 254 at 181 (6th ed. 2006)); *Oscanyan v. Arms Co.*, 103 U.S. 261, 263 (1880) ("Indeed, any fact, bearing upon the issues involved, admitted by counsel, may be the ground of the court's procedure equally as if established by the clearest proof."). They "have the effect of withdrawing a fact from issue and dispensing wholly with the need for [further] proof . . . ." *Perez-Mejia v. Holder*, 641 F.3d 1143, 1151 (9th Cir. 2011) (quoting *Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009)).

They are also binding. *United States v. Crawford*, 372 F.3d 1048, 1055 (9th Cir. 2004) (en banc) ("A judicial admission is binding before both trial and appellate courts."). "Litigants, we have long recognized, '[a]*re entitled* to have [their] case tried upon the assumption that . . . facts, stipulated into the record, were established.' " *Christian Legal*, 130 S. Ct. at 2983 (alterations in original) (emphasis added) (quoting *H. Hackfeld & Co. v. United States*, 197 U.S. 442, 447 (1905)). We must treat them as the "clearest proof." *Oscanyan*, 103 U.S. at 263 ("And if in the progress of a trial, either by such admission or proof, a fact is developed which must necessarily put an end to the action, the court may, upon its own motion, or that of counsel, act upon it and close the case."). We must treat them with the same degree of respect that the Court accorded the representations of the Solicitor General in *Munaf*. 553 U.S. at 702 (relying on the Solicitor General's representations concerning the non-refouler policy of the United States).

Accordingly, having established that the Secretary made the requisite determination, we must adhere to the Supreme Court's admonishment that, "in the absence of clear evidence

to the contrary, courts presume that [public officers] have properly discharged their official duties." *Brown v. Plata*, 131 S. Ct. 1910, 1965 (2011) (alteration in original) (internal quotation marks omitted) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chemical Found., Inc.*, 272 U.S. 1, 14-15 (1926))); *accord Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies."). To chastise the State Department and call into question the regularity of the Executive's treatment of Trinidad's plight is a serious matter. *See, e.g.*, *Chew Heong v. United States*, 112 U.S. 536, 540 (1884) ("[T]he court cannot be unmindful of the fact that the honor of the government and people of the United States is involved in every inquiry whether rights secured by such stipulations shall be recognized and protected.").

To do so without any contrary evidence, "let alone clear evidence," *Plata*, 131 S. Ct. at 1965, of irregularity is untenable. To do so without even an accusation of irregularity is appalling.[19] It wholly "want[s] in proper respect for the intelligence and patriotism of a co-ordinate department of the government." *Chew Heong*, 112 U.S. at 540. Thus, even were the majority correct that "[t]he process due here is that prescribed by the statute and implementing regulation," specifically that "[t]he Secretary must consider an extraditee's torture claim and find it not 'more likely than not' that the extraditee will face torture before extradition can occur," *Per Curiam* at 6401 (citing § 95.2), we must presume the Secretary complied with any pertinent obligations. *Plata*, 131 S. Ct. at 1965.

---

[19]Trinidad—the very individual with every incentive to contest the fact that the Secretary actually made the "torture determination"—never questioned the reality of the Secretary's decision. To be clear, no one has—no one other than my colleagues, who cast aside so many settled principles of law to do nothing more than act on a hunch to satisfy their own unsubstantiated suspicion.

Of course, the magnitude of the majority's misstep is all the more pronounced because, as discussed, neither the FARR Act nor the regulations limit the Executive's authority in the extradition context. *See Munaf*, 553 U.S. at 703 n.6; *cf. Pennhurst*, 451 U.S. at 19. Neither do any contain the necessary " 'explicitly mandatory language,' *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow, in order *to create a liberty interest*." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 463 (1989) (emphasis added) (citation omitted).

Frankly, the FARR Act contains nothing in the way of even mandatory language—other than its directive to create regulations to implement the United States' obligations under the Convention—let alone specific directives or substantive predicates. § 2242. And the regulations are no different. Rather than using " 'explicitly mandatory language,' in connection with the establishment of 'specified substantive predicates' *to limit discretion*," *Ky. Dep't of Corr.*, 490 U.S. at 463 (emphasis added), the regulations do the opposite. They carefully provide only that "the Department *considers* the question of whether a person facing extradition from the U.S. 'is more likely than not' to be tortured in the State requesting extradition *when appropriate* in making this determination." § 95.2(b) (emphasis added). Contrary to my colleagues' suggestion that "[t]he Secretary must consider an extraditee's torture claim and find it not 'more likely than not' that the extraditee will face torture before extradition can occur," *Per Curiam* at 6400-01, the words "must" and "shall" are entirely lacking. § 95.2(b). Accordingly, the regulations can only be interpreted as maintaining the traditional status quo— allowing the Secretary unbridled discretion "to surrender the fugitive to the requesting State, to deny surrender of the fugitive, or to surrender the fugitive subject to conditions." § 95.3(b) ("may"); § 95.4 ("Decisions of the Secretary concerning surrender of fugitives for extradition are matters of

executive discretion not subject to judicial review."); *cf.*
*Lopez-Smith*, 121 F.3d at 1326.[20]

In sum, I disagree with my colleagues' stubborn refusal to
accept that the Secretary has "properly discharged" her duty
and can conceive of no basis for countenancing a procedural
due process claim. Neither the FARR Act nor the regulations
impose on the Secretary a mandatory duty that could provide
Trinidad with a liberty interest in the Secretary's compliance
with any procedure. Thus, just as Trinidad cannot ask that we
second-guess the Secretary's ultimate discretionary decision,
*see Munaf*, 553 U.S. at 702, he cannot ask us to peek into
those internal processes employed by the Secretary in making
her determination.[21] Non-inquiry means just that, non-inquiry,
and remanding serves no purpose other than to further delay
the inevitable. *Id.* at 692 ("We accordingly hold that the
detainees' claims do not state grounds upon which habeas
relief may be granted, that the habeas petitions *should have
been promptly dismissed*, and that no injunction should have
been entered." (emphasis added)).

## II

This case presents a straightforward question with a
straightforward answer. Though we have habeas jurisdiction
to consider Trinidad's claim, that claim is squarely and
entirely foreclosed by the Rule of Non-Inquiry. *Id.* at 702-03.
By needlessly remanding, the majority ignores both the
Supreme Court's concern for promptness, *id.* at 692, as well

---

[20]As *Lopez-Smith* states: "We suppose there is nothing to stop Lopez-Smith's lawyer from putting together a presentation showing why the Secretary ought to exercise discretion not to extradite Lopez-Smith, and mailing it to the Secretary of State. As for whether the Secretary of State considers the material, and how the Secretary balances the material against other considerations, that is a matter exclusively within the discretion of the executive branch and not subject to judicial review." 121 F.3d at 1326.

[21]And there is thus no need to wade into the merits of Judge Berzon's unprecedented "limited" departure from the Rule of *Non*-Inquiry.

as a litany of controlling legal principles. It interjects yet another obstacle to impede the United States from fulfilling its treaty obligations, damaging our sovereign reputation and undoubtedly undermining *our* ability to obtain the cooperation of other countries when we need extradition assistance.

The only proper outcome of this case is to reverse the award of habeas relief, vacate the district court's discovery order seeking the Secretary's file, and order Trinidad's petition promptly dismissed. *See id.* We err by doing anything else.

---

BERZON, Circuit Judge, concurring in part and dissenting in part, with whom Judge W. Fletcher joins:

Hedelito Trinidad y Garcia ("Trinidad") claims that if extradited to the Philippines, he is more likely than not to be tortured, and that the Secretary of State's decision to extradite him is therefore unlawful under the Convention Against Torture and the federal statute implementing it, the Foreign Affairs Reform and Restructuring Act of 1998 (the FARR Act), Pub. L. No. 105-277, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note). The *per curiam* majority opinion holds that: (1) we have jurisdiction to hear Trinidad's challenge to his extradition; (2) as a matter of due process, the Secretary of State is required to consider Trinidad's claim that he will be tortured if returned to the Philippines and to refrain from extraditing him if she finds it "more likely than not" that he will indeed be tortured; and (3) without a declaration from the Secretary (or her delegate) that the Secretary has fulfilled her obligation, there is insufficient evidence in the record to determine whether she has done so. I agree. I therefore concur in Parts 1-5 of the majority opinion.

I cannot, however, agree with the majority's ultimate holding that once the Secretary (or her delegate) meets the proce-

dural due process requirement by submitting a barebones declaration, courts under no circumstances have authority to conduct *any* substantive review of the Secretary's compliance with federal law.

There is no reason for the majority even to reach this question. Once the majority determines that there has been a procedural due process violation and that therefore "we lack sufficient basis in the record to review the district court's order granting Trinidad y Garcia's release," Per curiam at 6401, we should simply remand for the submission of an appropriate declaration. If there is a subsequent appeal, we could then determine whether further substantive review is available and, if so, whether the record is adequate for that purpose.

The majority nevertheless jumps the gun and dismisses Trinidad's substantive claims, holding, with little explanation, that they are foreclosed by the Supreme Court's decision in *Munaf v. Geren*, 553 U.S. 674 (2008), the doctrine of separation of powers, and the "rule of non-inquiry." Per curiam at 6402. Judge Tallman elaborates on these points at length and adds another—the contention that Trinidad has no statute-based claim at all. Tallman dissent at 6429-35. I cannot go along with either the majority's curt conclusion or Judge Tallman's more discursive analysis. I therefore concur in the majority's result—a remand to the district court for further development of the record—but not in its declaration that *under no circumstances* can a district court go further than to require a pro forma declaration from the Secretary of State in a case in which it is alleged that extradition will likely result in torture.

\*\*\*

I begin by outlining the basic building blocks of Trinidad's substantive, statute-based claim.

First, we may grant a writ of habeas corpus where a prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).[1]

Second, Article 3 of the Convention Against Torture (CAT), which entered into force for the United States in 1994, states:

> No State Party shall expel, return ("*refouler*") or extradite a person to another state where there are substantial grounds for believing that he would be in danger of being subjected to torture.

United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, adopted by unanimous agreement of the U.N. General Assembly, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51 at 197, U.N. Doc. A/RES/39/708 (1984), entered into force as to the United States Nov. 20, 1994, signed Apr. 18, 1988. The Senate ratified CAT with the understanding that "the phrase, 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' " would be understood to mean " 'if it is more likely than not that he would be tortured.' " U.S. Senate Resolution of Advice and Consent to Ratification of the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, 136 Cong. Rec. 36, 198 (Oct. 27, 1990).

The language of Article 3 is mandatory. Whereas some CAT provisions limit signatories' obligation to enforce a policy, *see, e.g.*, Article 13 ("*Steps shall be taken to* ensure that

---

[1] Those detained pending extradition have long been understood to be "in custody" for the purposes of habeas relief. *See Ornelas v. Ruiz*, 161 U.S. 502 (1896); *Oteiza v. Jacobus*, 136 U.S. 330 (1890); *Benson v. McMahon*, 127 U.S. 457 (1888); *see also* Gerald L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens*, 98 Colum. L. Rev. 961, 985 (1998).

. . ." (emphasis added)); Article 14 (requiring that signatories provide torture victims "the means for *as full* rehabilitation *as possible*" (emphasis added)), Article 3 has no such equivocation or limitation. Signatories are not, for example, prohibited from expelling individuals likely to face torture "where feasible" or "to the extent possible." *Cf. INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) (distinguishing between a treaty provision that creates an entitlement to be protected from expulsion and one that is discretionary). Instead, the CAT Article 3 prohibition is general and unlimited: Without exception, a signatory country may not extradite a person likely to face torture.

The final building block of Trinidad's statute-based claim is the FARR Act, which, echoing the language of CAT, provides that:

> It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . .

8 U.S.C. § 1231 note. The FARR Act then directs "the heads of the appropriate agencies" to "prescribe regulations to implement the obligations of the United States." *Id.* As the government recognizes in its brief, the FARR Act thereby "prohibits the extradition of a person who more likely than not will be tortured, and . . . creates a duty on the part of the Secretary of State to implement that prohibition."[2]

---

[2]Although Judge Tallman characterizes the government's position otherwise, it is clear to me that the government's position is that the Secretary of State may not extradite someone who is more likely than not to face torture. In addition to the statement quoted in the text above, the government, in its brief, also clearly and emphatically stated that "[t]he Government is *not* arguing that the Secretary of State has discretion to surrender a fugitive who more likely than not will be tortured."

Contrary to Judge Kozinski's assertion, Trinidad's claim is *not* that he is entitled to habeas because of the treatment he is likely to face in the Philippines. Rather, his claim is a claim that because the FARR Act prohibits extradition if, on the information available to the Secretary, he more likely than not will be tortured, the Secretary's decision to extradite him would be illegal under positive, Congressionally enacted federal law. In other words, the focus of Trinidad's habeas petition is on the legality of the Secretary's decision, *not* on whether or not Trinidad will actually be tortured if extradited. This claim is one at the "historical core" of habeas review. *INS v. St. Cyr*, 533 U.S. 289, 301 (2001). Indeed, it is "as a means of reviewing the legality of Executive detention . . . that [the] protections [of the writ of habeas corpus] have been strongest." *Id.*; *see generally* Gerald L. Neuman, *The Habeas Corpus Suspension Clause After* Boumediene v. Bush, 110 COLUM. L. REV. 537, 541 (2010).

As I explain below, neither the Supreme Court's decision in *Munaf* nor the rule of non-inquiry *entirely* forecloses our ability to review the lawfulness of an extradition decision by the Executive. I would hold, therefore, that we have the authority—and, indeed, the obligation—to review the Secretary of State's determination and to decide—under a standard highly deferential to the Secretary and procedures carefully tailored to ensure the protection of the Secretary's diplomatic concerns—whether it is more likely than not that petitioners such as Trinidad will be tortured if extradited. For that purpose, it may be that in many circumstances a declaration such as the one the majority requires will suffice. But, as I shall explain below, not invariably.

## I.   The FARR Act

Before doing so, however, I address a separate proposition put forth by Judge Tallman but not addressed by the majority. Judge Tallman maintains that despite the Government's emphatic assertion to the contrary, the FARR Act does not

actually restrict the Executive's discretion to extradite, even when it is more likely than not that an individual will be tortured. Instead, Judge Tallman insists, the FARR Act is merely "precatory"; it serves no other purpose than to " 'nudge' " the government in Congress's " 'preferred direction[ ].' " Tallman dissent at 6436-37 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 19 (1981)). This understanding of the Act could not be more wrong.

Judge Tallman's argument proceeds from his reading of section (a) of the FARR Act. According to Judge Tallman, that section, which states that "[i]t shall be the policy of the United States not to . . . extradite . . . any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture," 8 U.S.C. § 1231 note, only announces a general policy of the United States, imposing no obligation on the Executive to comply in any specific instance. For this proposition, he relies on *Pennhurst*.

*Pennhurst* concerned whether the statement of congressional findings included in the federal Developmentally Disabled Assistance and Bill of Rights Act imposed upon the states an obligation to fund particular kinds of mental healthcare entitlements. For several reasons, the case is entirely inapposite here.

For one thing, the statute at issue in *Pennhurst* was passed either pursuant to Congress's power under § 5 of the Fourteenth Amendment or pursuant to its spending power.[3] The Supreme Court has held that statutes passed pursuant to either of these powers and intended by Congress to impose obligations on the states must clearly state this intention, particularly where the obligation is the creation of an affirmative entitlement. *See id.* at 16-18. The FARR Act, however, binds only

---

[3]The litigants in *Pennhurst* disagreed on this point. *See Pennhurst*, 451 U.S. at 14.

the federal government; it does not purport to impose any obligations upon the states. As a result, the federalism concerns animating *Pennhurst* simply do not apply here, and no clear statement rule of the kind applied in *Pennhurst* applies to this case.

In addition, the Supreme Court found the language at issue in *Pennhurst* ambiguous as to whether it imposed an obligation upon the states enforceable by individuals. The Court therefore turned to the remainder of the statute to determine whether, in context, the import of the ambiguous provision became clear. *See id.* at 19. The disputed congressional "findings" in *Pennhurst* were embedded in a statute, other sections of which clearly and explicitly imposed obligations on the states. *See id.* These specific obligations would have been redundant were the more general "findings" in the statute considered binding commands. *See id.* at 19, 25-27. The FARR Act contains no analogous specific provisions.

In fact, consistent with the Government's position, the text and structure of the FARR Act confirm that it *does* impose a binding obligation on the Secretary of State not to extradite individuals likely to face torture. Subsection (a) of the FARR Act incorporates the language of CAT itself, enacting as U.S. domestic policy the international obligation the United States undertook in ratifying CAT. *See* 8 U.S.C. § 1231 note. The remainder of the Act then directs the Executive "to implement the obligations of the United States under" CAT and specifies how such implementation ought to occur. *Id.* Whereas the statute at issue in *Pennhurst* combined an aspirational vision for the ideal treatment of people with disabilities with more specific mandates, there is nothing aspirational about the FARR Act. It states a policy and directs agencies to implement that policy. If this policy is merely precatory, then all of the FARR Act would also be so. I cannot agree that Congress passed a statute with no intent to affect anyone's rights or obligations.

Judge Tallman, however, reads the FARR Act's incorporation of CAT differently, maintaining that the Act's direction in subsection (b) that "the heads of appropriate agencies shall prescribe regulations to implement" the United States' "obligations" under CAT, *id.*, "conflicts with Trinidad's assertion that the FARR Act itself implements the Convention and binds Executive authority." Tallman dissent at 6434. Trinidad's assertion, however, is that the FARR Act implements CAT, and so makes the United States' obligations under CAT binding not only as a matter of international law—as they became when the United States signed CAT—but as a matter of U.S. law. The FARR Act's mandate to agencies that they "implement" the United States' obligations under CAT is a direction to put into practice the mandatory Article 3 obligations undertaken by signing CAT and incorporated into U.S. law by the FARR Act. That mandate would be absurd if, as Judge Tallman insists, no such obligations exist under U.S. law at all.

Further, assuming subsection (a) does no more than express a general policy, subsection (b) of the FARR Act is unquestionably obligatory. Thus, even disregarding entirely subsection (a), subsection (b) compels the conclusion that the FARR Act imposes upon the Executive an obligation to abide by CAT.

As a fallback to his insistence that the FARR Act is simply precatory and does not bind the executive at all, Judge Tallman more modestly proposes that subsection (d) of the Act demonstrates that "Congress did not intend to impose an obligation on the Executive outside the removal context." Tallman dissent at 6435-36. In other words, Judge Tallman suggests a cleavage in the substantive duty created by the Act between the Executive's obligation in the immigration removal context and that applicable in all other circumstances, including extradition. This more narrow contention fares no better than Judge Tallman's broader, *Pennhurst*-grounded one.

The problem with this alternative suggestion is that there is no indication whatsoever in the statute that the substantive obligations it imposes vary by context. Subsection (d), on which Judge Tallman relies for his contrary proposition, describes only courts' authority to review FARR Act claims, not the *substantive* reach of the underlying governmental obligation. That the FARR Act specifically allows for jurisdiction to review claims in the removal context but leaves review in any other context dependent on pre-existing jurisdiction (as Judge Tallman recognizes in his jurisdictional analysis) does not alter the substance of the obligation the Act creates. That obligation, the imposition of a uniform policy prohibiting "the involuntary return of any person to a country" where the person likely to face torture, 8 U.S.C. § 1231 note, is affirmatively stated and generally applicable.

If anything, the inclusion of the provision addressing courts' jurisdiction to review FARR Act claims further supports the view that the Act creates obligations out of which claims could arise. A provision allowing for the review of FARR Act claims as part of the review of final orders of removal would be meaningless if no such claims could ever arise because the FARR Act created no governmental duty with regard to expelling individuals facing torture.

Judge Tallman's last stab at finding a basis for declaring that, despite the FARR Act, the Government still has discretion to extradite a detainee facing torture is a State Department regulation providing that the Secretary's extradition decisions "are matters of executive discretion not subject to judicial review."[4] 22 C.F.R. § 95.4. But the parties, the Supreme Court, and the courts of appeals have all taken the view that the FARR Act implements CAT by incorporating

---

[4]I note that, with the exception of Judge Kozinski, the entire en banc panel agrees that we have jurisdiction, and that the majority of us agree that the Secretary's decision is reviewable at least to the extent of requiring an attestation of compliance with the FARR Act and CAT.

the obligations undertaken in the treaty into domestic law, thereby eliminating any discretion the Secretary of State might otherwise have had to extradite a person likely to face torture. The State Department, in particular, not only, as noted, agrees in its brief with Trinidad's contention that "the FARR Act creates a duty on the part of the Secretary of State to implement" the Act's "prohibition" against extraditing "a person who more likely than not will be tortured," but further assures us that it "is *not* arguing that the Secretary of State has discretion to surrender a fugitive who more likely than not will be tortured, even if foreign policy interests at the time would be served by an extradition." The Secretary's own interpretation of the regulation upon which Judge Tallman relies is clearly that, whatever discretion the State Department has over extradition decisions, its discretion does not extend to the ability to extradite an individual likely to face torture. This interpretation is controlling. "[W]e defer to an agency's interpretation of its own regulation, advanced in a legal brief, unless that interpretation is 'plainly erroneous or inconsistent with the regulation.' " *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880 (2011) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). Given the Secretary's contrary view, Judge Tallman's reading of the State Department regulations as providing discretion with regard to FARR Act obligations cannot stand.

Consistent with the Government's understanding, the Supreme Court, in *Medellin v. Texas*, cited the FARR Act as exemplifying a statute by which a treaty (CAT) had been given "wholesale effect . . . through implementing legislation." *Medellin v. Texas*, 552 U.S. 491, 520 (2008). Were we to hold that the FARR Act did not, in fact, implement as domestic law the obligations undertaken in CAT, but only "nudged" the Executive toward refraining from sending persons abroad to face torture, we would be contradicting the view expressed—albeit in dicta—by the Supreme Court.

We would also be overruling several of our own circuit's cases. *See, e.g.*, *Edu v. Holder*, 624 F.3d 1137, 1144 (9th Cir.

2010) ("Congress then implemented CAT in the Foreign Affairs Reform and Restructuring Act of 1998."); *Huang v. Ashcroft*, 390 F.3d 1118, 1121 (9th Cir. 2004) ("Congress passed the Foreign Affairs Reform and Restructuring Act (the FARR Act) in 1998 to implement Article 3 of CAT."); *Zheng v. Ashcroft*, 332 F.3d 1186, 1193 (9th Cir. 2003) ("In 1998, Congress passed the Foreign Affairs Reform and Restructuring Act of 1998, implementing Article 3 of the Convention Against Torture."). Furthermore, we would be contradicting the law of our sister circuits, none of which has doubted that the FARR Act implements CAT. *See, e.g.*, *Omar v. McHugh*, 646 F.3d 13, 18 n.2 (D.C. Cir. 2011) ("[I]t is undisputed that the FARR Act implements the Convention Against Torture."); *Pierre v. Att'y Gen.*, 528 F.3d 180, 185-86 (3d Cir. 2008) ("[I]n 1998, Congress passed legislation to implement the United States' obligations under the CAT: the Foreign Affairs Reform and Restructuring Act ('the FARR Act')."); *Pierre v. Gonzales*, 502 F.3d 109, 114 (2d Cir. 2007) ("To implement the CAT, Congress amended the immigration laws with the Foreign Affairs Reform and Restructuring Act of 1998 ('the FARR Act')."); *Cadet v. Bulger*, 377 F.3d 1173, 1180 (11th Cir. 2004) ("In order to implement Article 3 of CAT, Congress passed the Foreign Affairs Reform and Restructuring Act of 1988 ('the FARR Act').").

There is simply no doubt that as a substantive matter, the FARR Act imposes a binding obligation on the Secretary of State not to extradite a person likely to face torture. The majority agrees with this proposition. Per curiam at 6400-01.

## II. *Munaf v. Geren*

The majority does maintain that once the Secretary provides a declaration stating that she complied with her CAT and FARR Act obligations, *Munaf* (and the "rule of non-inquiry," which I address in due course) preclude judicial inquiry in any and all circumstances—even if, for example, there was irrefutable evidence that torture was indeed more

likely than not to occur were the detainee to be extradited. Per curiam at 6402. I cannot agree.

*Munaf* does not foreclose, or even very much affect, our authority to review Trinidad's FARR Act claim. To begin, *Munaf* emphatically declined to decide the question at issue here—whether the FARR Act provides a basis for habeas review of the Secretary of State's extradition decisions. That *Munaf* reserved rather than decided the question before us could not be more clear. The Court stated:

> Petitioners briefly argue that their claims of potential torture may not be readily dismissed . . . because the FARR Act prohibits transfer when torture may result. Neither petitioner asserted a FARR Act claim in his petition for habeas, and the Act was not raised in any of the certiorari filings before this Court. Even in their merits brief in this Court, the habeas petitioners hardly discuss the issue. The Government treats the issue in kind. Under such circumstances *we will not consider the question*.

*Munaf*, 553 U.S. at 703 (internal citations omitted and emphasis added).

This reservation in *Munaf* is of more than technical import. It indicates that there at least *could* be some difference of controlling significance between a claim based on an affirmative Congressional enactment, like the FARR Act, placing obligations on the Executive Branch and a constitutionally based norm, such as the one invoked in *Munaf*. Had it been clear that there is no such possible difference, as the majority opinion in this case tacitly assumes, then there would have been no reason to reserve the question.

Moreover, not only is there no applicable holding in *Munaf*; there is no applicable reasoning or implicit "message" either. Instead, the Court's reasoning in *Munaf* is tightly bound to the

factual and legal circumstances in which the case arose, *see id.* at 700 (characterizing its analysis as applying "in the present context"), circumstances that differ completely from those here.

Most notably, *Munaf* was not an extradition case. The *Munaf* petitioners were detained in Iraq, at the request of the Iraqi government, by an international military coalition commanded by the United States. The charges against them were that they violated Iraqi criminal law. They sought not the traditional habeas remedy of release from executive detention but, rather, affirmative protection from the reach of the Iraqi government. As the *Munaf* Court explained:

> [T]he nature of the relief sought by the habeas petitioners suggests that habeas is not appropriate in these cases. Habeas is at its core a remedy for unlawful executive detention. The typical remedy for such detention is, of course, release. But here the last thing petitioners want is simple release; that would expose them to apprehension by Iraqi authorities for criminal prosecution—precisely what petitioners went to federal court to avoid. At the end of the day, what petitioners are really after is a court order requiring the United States to shelter them from the sovereign government seeking to have them answer for alleged crimes committed within that sovereign's borders.

*Id.* at 693-94; *see also id.* at 704 ("Omar and Munaf voluntarily traveled to Iraq and are being held there. They are therefore subject to the territorial jurisdiction of that sovereign, not of the United States. . . . It would be more than odd if the [U.S.] Government had no authority to transfer them to the very sovereign on whose behalf, and within whose territory, they are being detained."). The relief the *Munaf* petitioners sought was thus farther from the historical remedy available under habeas than the relief Trinidad seeks—simple release

from custody—and more deeply implicated issues of national sovereignty and international comity.

I make this distinction not to suggest that there are not real foreign affairs and international comity concerns in ordinary extradition cases such as this one. *See* Part IV *infra*. But these concerns simply do not rise to the level of those at issue in *Munaf*. While significant, the foreign affairs and comity concerns in the present circumstances are manageable through appropriately deferential habeas procedures and limitations on the scope of judicial review, as I suggest below.

Furthermore, the *Munaf* petitioners' claims raised military and national security concerns that Trinidad's claims do not. At least one of the *Munaf* petitioners was charged with terrorism-related crimes. And the Court repeatedly emphasized that the case took place "in the context of ongoing military operations." *Id.* at 689.

Moreover, and critically for present purposes, *Munaf* affirmatively left open not only the FARR Act issue but also the question of whether the result could be different in "a more extreme case in which the Executive has determined that a detainee is likely to be tortured but decides to transfer him anyway." *Id.* at 702. Justice Souter, joined by Justices Ginsburg and Breyer, saw a wider opening; they "would extend the caveat to a case in which the probability of torture is well documented, even if the Executive fails to acknowledge it." *Id.* at 706 (Souter, J., concurring). The majority here, however, closes the door *Munaf* opened, ruling that once a detainee in Trinidad's position is afforded the procedural assurance that the Secretary has considered her CAT obligations, there is no substantive review whatsoever available, constitutional or statutory, no matter what the underlying circumstances.

I conclude that given *Munaf*'s refusal to answer the question presented in this case, as well as the substantial differences between the two cases, *Munaf* is of little use here.

### III.   The Rule of Non-Inquiry

The majority's, and Judge Tallman's, more basic ground for shutting the door on *any* judicial consideration of Trinidad's substantive claims is the rule of non-inquiry. Consideration of the background and role of that principle in extradition cases demonstrates that it does not apply—at least without substantial adjustment—where, as here, there is a specific, mandatory directive to the Executive Branch with regard to the treatment of extradition requests.

There is no constitutional or statutory command establishing a rule of non-inquiry—that is, a rule precluding any substantive judicial inquiry into the likely fate of extradited criminal defendants.[5] Rather, the traditional principle that has been dubbed the "rule of non-inquiry" developed as a judge-made doctrine, under which "[a]n extraditing court will generally not inquire into the procedures or treatment which await a surrendered fugitive in the requesting country." *Arnbjornsdottir-Mendler v. United States*, 721 F.2d 679, 683 (9th Cir. 1983).

The Supreme Court has never used the term "rule of non-inquiry," let alone explicated its scope or proper application. Instead, the doctrine developed "by implication," as lower courts interpreted and expounded upon Supreme Court extra-

---

[5]In fact, Congress has considered and rejected legislation that would codify the rule of non-inquiry. *See* Jacques Semmelman, *Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings*, 76 CORNELL L. REV. 1198, 1220-21 (1991); *see also In re Extradition of Howard*, 996 F.2d 1320, 1330 n.6 (1st Cir.1993) ("The government suggests that the Constitution mandates the rule of non-inquiry. We disagree. The rule did not spring from a belief that courts, as an institution, lack either the authority or the capacity to evaluate foreign legal systems. Rather, the rule came into being as judges, attempting to interpret particular treaties, concluded that, absent a contrary indication in a specific instance, the ratification of an extradition treaty mandated noninquiry as a matter of international comity.").

dition precedents. *See* Semmelman, *supra* at 1211-12; *Mironescu v. Costner*, 480 F.3d 664 (4th Cir. 2007); John T. Parry, *International Extradition, the Rule of Non-Inquiry, and the Problem of Sovereignty*, 90 B.U.L. Rev. 1973, 1978-96 (2010).

Since the late nineteenth century, extradition has been a bifurcated process, with the initial determination of extraditability assigned by statute to a magistrate,[6] *see* 18 U.S.C. § 3184, and the final decision to the Secretary of State. In elaborating the rule of non-inquiry, courts have relied on two strands of late nineteenth and early twentieth century extradition caselaw.

The first strand of rule of non-inquiry jurisprudence arises out of a series of cases in which the Supreme Court articulated the extradition issues subject to review by a habeas court when examining a magistrate's decision certifying extraditability. *See, e.g., Fernandez v. Phillips*, 268 U.S. 311 (1925); *Oteiza v. Jacobus*, 136 U.S. 330 (1890); *Benson v. McMahon*, 127 U.S. 457 (1888). At issue in these early cases was the procedure and evidence of guilt required before a magistrate could issue a certificate of extraditability.

The Court's initial cases in this line established that an extradition proceeding is not analogous to a criminal trial, "by

---

[6]The statute setting forth the procedures for extradition delegates to "any Justice of the Supreme Court, circuit judge, district judge, commissioner, authorized to do so by any of the courts of the United States, or judge of a court of record of general jurisdiction of any state" the authority to charge a person with having committed an extraditable offense, issue a warrant for that person's apprehension, and make an initial assessment of the sufficiency of the evidence against the person and certify the person's extraditability. 18 U.S.C. § 3184. Although judicial officers are involved in this initial determination of extraditability, they are not acting in their Article III capacity—indeed, they are often not Article III judges. I will therefore refer to the judicial officers making extradition determinations in the first instance as "magistrates."

which the prisoner could be convicted or acquitted of the crime charged against him," but is more like a preliminary hearing "for the purpose of determining whether a case is made out which will justify the holding of the accused" for trial. *Oteiza*, 136 U.S. at 334-35; *see also Benson*, 127 U.S. at 462. The scope of review by a habeas court is correspondingly narrow: On habeas, courts need and ought not issue "a writ of error," examining all possible procedural defects of an extradition proceeding, *Oteiza*, 136 U.S. at 334, for "[f]orm is not to be insisted upon beyond the requirements of safety and justice," *Fernandez*, 268 U.S. at 312 (internal citation omitted). Instead, it is sufficient that there be "[c]ompetent evidence to establish reasonable grounds" for extradition; the evidence (and the procedure used to evaluate it) need not be "competent to convict." *Id.* Habeas review of a magistrate's extradition decision, then, "is available only to inquire whether the magistrate had jurisdiction, whether the offence charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Id.*

From this language, Judge Tallman concludes that judicial review in *all* extradition cases is limited to such a narrowly circumscribed examination of a magistrate's finding of extraditability and of the magistrate's jurisdiction to enter such a finding. This position rests on a misunderstanding of the Court's earliest extradition cases. Those cases, as I have explained, dealt solely with challenges to the extradition proceedings held before a magistrate and were designed only to ensure that there was some basis for the extradition request. There was no claim in these cases that, for example, the Secretary of State's decision to extradite was contrary to law or, in particular, that the petitioner would face torture if extradited. Given their narrow purview, this line of magistrate review cases does not broadly limit the kinds of claims that may be brought to contest extradition or delimit the scope of judicial review with respect to all such claims. Rather, *Fer-*

*nandez* and similar cases established the scope of review for one *particular* kind of claim—a claim that the magistrate's decision to certify extraditability was improper. In other words, as the Seventh Circuit has recognized, "these references [to limited review of extradition decisions] . . . have occurred in cases that have involved challenges to the findings of the magistrate in the magistrate's certification hearing and have not involved constitutional challenges to the conduct of the executive branch in deciding to extradite the accused." *In re Burt*, 737 F.2d 1477, 1483 (7th Cir. 1984).

Exemplifying the second strand of Supreme Court cases from which the federal courts have derived the rule of non-inquiry is *Neely v. Henkel*, 180 U.S. 109 (1901), upon which Judge Tallman heavily relies. In *Neely*, Charles Neely, accused of embezzling public funds while serving as Finance Agent of the Department of Posts in Cuba, challenged the constitutionality of the statute governing extradition. The statute, Neely argued, "d[id] not secure to the accused, when surrendered to a foreign country for trial in its tribunals, all of the rights, privileges and immunities that are guaranteed by the Constitution to persons charged with the commission in this country of crime against the United States." *Id.* at 122. As a consequence, Neely maintained, the federal courts had the authority and responsibility to declare the statute invalid and order his release. The Court rejected this argument, explaining that the constitutional provisions cited by Neely, those

> relating to the writ of habeas corpus, bills of attainder, ex post facto laws, trial by jury for crimes, and generally to the fundamental guarantees of life, liberty and property . . . . have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country.
>
> . . . . When an American citizen commits a crime in a foreign country he cannot complain if required to submit to such modes of trial and to such punish-

ment as the laws of that country may prescribe for its own people, *unless a different mode be provided for by treaty stipulations between that country and the United States*.

*Id.* at 123 (emphasis added).

Essentially, then, *Neely* expresses the noncontroversial proposition that the United States Constitution does not bind other nations. Trinidad's claim that he will face torture if extradited is superficially similar to Neely's claim that he would face an abrogation of his constitutional rights, privileges, and immunities upon extradition to Cuba; both are claims about the treatment an extraditee is likely to face in the requesting country. Importantly, however, Trinidad does not claim that he has a right under the U.S. Constitution not to be tortured in the Philippines by Philippine officials. Rather, Trinidad's claim is based on an affirmative Congressional enactment that enforces a treaty obligation—which *Neely* recognizes may be subject to domestic enforcement—and that, as I have shown, binds U.S. government officials and prohibits them from extraditing persons likely to be tortured. So, in this case, the issue is not whether foreign officials may be bound by U.S. norms, or about whether the judiciary, rather than the Executive Branch, can enforce constitutional norms with regard to extradition requests. Instead, the question here concerns the role of the judiciary in enforcing the statutory obligations affirmatively placed upon U.S. officials by Congress. In other words, Judge Kozinski's argument notwithstanding, the claim is not—or, at least, not solely—about Trinidad's rights once extradited, but rather about the legitimate scope of executive authority—and, in particular, compliance with Congressional limits on that authority designed to ensure compliance with treaty obligations.

This difference is not merely semantic. Whatever authority we may have to review claims that an individual ought not be

extradited because of conditions in the receiving country,[7] we certainly have the authority and the responsibility to review the legality of executive detention. While the judiciary may not evaluate the constitutionality of the conduct of foreign governments, it is indubitably the role of courts to ensure that American officials obey the law. Indeed, courts have repeatedly declined to apply the rule of non-inquiry to claims that the Executive has acted unlawfully. *See, e.g.*, *Mironescu v. Costner*, 480 F.3d 664, 670-71 (4th Cir. 2007); *In re Burt*, 737 F.2d at 1483; *Plaster v. United States*, 720 F.2d 340, 348 (4th Cir. 1983); *see also* Parry, *supra*, at 1998-99.

The Executive's authority to extradite is neither inherent nor unlimited. Rather, "[i]n the extradition context, when a 'fugitive criminal' is found within the United States, 'there is no authority vested in any department of the government to seize [him] and surrender him to a foreign power' in the absence of a pertinent constitutional or legislative provision." *Munaf*, 553 U.S. at 704 (quoting *Valentine v. United States*, 299 U.S. 5, 9 (1936)). As "[t]here is no executive discretion to surrender [a person] to a foreign government, unless that discretion is granted by law," *Valentine*, 299 U.S. at 9, that discretion is circumscribed by the terms of such delegation.

---

[7]Several courts have suggested, though no case has yet been decided on this basis, that there may be a "humanitarian exception" to the rule of non-inquiry. *See, e.g. Lopez-Smith v. Hood*, 121 F.3d 1322, 1326-27 (9th. Cir. 1997); *Prushinowski v. Samples*, 734 F.2d 1016, 1019 (4th Cir. 1984); *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960) ("We can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require a reexamination" of the rule of non-inquiry); *see also Munaf*, 553 U.S. at 702 (distinguishing *Munaf*, in which the Supreme Court denied habeas from "a more extreme case in which the Executive has determined that a detainee is likely to be tortured but decides to transfer him anyway"). Because I believe that the rule of non-inquiry, as it has heretofore been developed, is not directly applicable to this case, I need not address the possibility that an exception to the rule might apply.

Habeas review in this statutory context, then, does not violate separation of powers principles. On the contrary, it prevents the inappropriate concentration of power within a single branch, where that branch has been assigned mandatory obligations. Judicial review of compliance with Congress's directives concerning extradition preserves "the delicate balance of governance," ensuring that the executive's discretion to extradite is exercised within the parameters of the law established by Congress. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004). The preservation of this separation of powers serves to secure individual liberty, preventing the extradition of those likely to face torture. "Security subsists, too, in fidelity to freedom's first principles. Chief among these are freedom from arbitrary and unlawful restraint and the personal liberty that is secured by adherence to the separation of powers. It is from these principles that the judicial authority to consider petitions for habeas corpus relief derives." *Boumediene v. Bush*, 553 U.S. 723, 797 (2008).

Judge Tallman argues that, whatever the limits on the executive's authority to extradite, we do not have the power to review compliance with those limitations, unless specifically authorized by Congress. Indeed, on Judge Tallman's view, we may not review *any* aspect of extradition absent specific congressional authorization. The Supreme Court, he explains, has "refused to extend judicial review in extradition cases, regardless of the nature of the perceived violation, absent specific direction from Congress." Tallman dissent at 6420 n.6. *Neely* itself, upon which Judge Tallman rests much of his opinion, belies this assertion.

In addition to considering whether Neely could be extradited to Cuba, even though Cuba lacked many of the constitutional protections available to defendants in the United States, the Supreme Court also considered whether Congress had the power to pass the statute under which Neely was extradited and whether Neely's extradition fell within the scope of that statute. These are not claims that Congress has explicitly

authorized courts to review in the extradition context. Nevertheless, the Court did not refuse to review such claims. Thus, while *Neely* holds that it does not violate the Constitution or laws of the United States to extradite someone to a country that does not offer criminal defendants the same procedural protections as the United States, the case contains no indication that extraditions that *do* violate the Constitution or laws of the United States might, as Judge Tallman contends, not be subject to habeas review—indeed, it suggests the contrary.

So too does *Valentine*, also cited by Judge Tallman. The U.S. citizen respondents in *Valentine* claimed that because the relevant treaty stated that the United States was not bound to extradite its own citizens, "the President had no constitutional authority to surrender" them. *Valentine*, 299 U.S. at 6. The Supreme Court not only reviewed this claim, but granted habeas on that basis. *Id.* at 18. Similarly, here, Trinidad claims that the Secretary of State lacks the authority to surrender him. Indeed, Trinidad's claim is arguably stronger than that of the extraditees in *Valentine*: CAT, as implemented by the FARR Act, does not merely state that the Executive is not required to extradite those likely to face torture; it affirmatively denies that power. I conclude that the rule of non-inquiry does not bar this claim.

As I have shown, the judicially developed rule of non-inquiry was not developed in, and does not have direct application to, judicial enforcement of obligations imposed by statute upon executive officials. The rule bars judicial examination of extraditions once it is determined that they are not contrary to the Constitution, laws, or treaties of the United States. It does not hold that we must refrain from reviewing claims that an extradition is, in fact, unlawful.

I note that this seems to be Judge Thomas's understanding as well. Thomas conc. at 6408. He agrees that the FARR Act limits the Executive's authority to extradite and that courts may enforce this limitation through habeas. My disagreement

with his concurrence is in how we construe the obligation the FARR Act imposes: Judge Thomas characterizes the obligation of the Secretary of State as a "duty . . . to *consider* whether a person facing extradition from the U.S. 'is more likely than not' to be tortured." Thomas conc. at 6408. If this were the extent of the duty imposed by the Act, I would agree that our review of the Secretary's compliance was limited to requiring a declaration that she had, indeed, considered whether Trinidad would be tortured upon extradition. But, as I have explained—and as the parties agree—the duty imposed upon the Secretary extends beyond simply *considering* whether Trinidad is more likely than not to face torture. She is required not to extradite him if there are substantial grounds to believe that he is more likely than not to face torture. Judicial review, therefore, must extend not only to determining whether the Secretary *considered* Trinidad's claim that he would be tortured but to ascertaining that she complied with her obligation not to extradite where, on the available information, torture is more likely than not.

This conclusion does not resolve this FARR Act extradition case or any other. It merely establishes that substantive judicial review is not *entirely* precluded in this species of case and that we are writing on a clean slate in this case with regard to the reach of that review and the appropriate procedures that should be used.

## IV.   Proposed Proceedings

In approaching these questions afresh, I begin with the Supreme Court's recognition in *Boumediene* that "common-law habeas corpus was, above all, an adaptable remedy. Its precise application and scope changed depending upon the circumstances." *Id.* at 779. The scope of habeas review is, in other words, not fixed. Rather, its proper application depends upon the circumstances in which it is to be applied. *See id.* In the circumstances of this case, I would, on habeas, apply what one might call a "rule of limited inquiry," designed to ensure

against blatant violations of the Secretary's CAT obligations as implemented by the FARR Act.

I begin from what *Boumediene* identified as two "uncontroversial" features of any habeas review: (1) the detainee must have "a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law"; and (2) "the habeas court must have the power to order the conditional release of an individual unlawfully detained." *Id.* at 779 (quoting *St. Cyr*, 533 U.S. at 302). But, likening habeas to procedural due process, the opinion further stated that "the necessary scope of habeas review in part depends upon the rigor of any earlier proceedings." *Id.* at 781.

The underlying proceeding in *Boumediene* was the Combatant Status Review Tribunal (CSRT), which the Deputy Secretary of Defense had established to evaluate the enemy combatant status of those detained at Guantanamo. *Id.* at 733. Habeas review of CSRT determinations, *Boumediene* explained, was "more urgent" than review of an ordinary judicial or even administrative proceeding, because CSRT determinations were not the result of a judicial hearing before a neutral decisionmaker. *Id.* at 783. Even where "all the parties involved . . . act with diligence and in good faith, there is considerable risk of error in the tribunal's findings," due to the " 'closed and accusatorial' " nature of the proceeding. *Id.* at 785 (quoting *Bismullah v. Gates*, 514 F.3d 1291, 1296 (D.C. Cir. 2008)). Given the consequence of error—detention for the course of an indefinite war—this "risk," the opinion stated, is "too significant to ignore." *Id.* In the CSRT context, therefore, a habeas court must have at least "some authority to assess the sufficiency of the Government's evidence against the detainee," as well as "the authority to admit and consider relevant exculpatory evidence that was not introduced during the earlier proceeding." *Id.* at 786.

The proceeding at issue here is quite different from the CSRTs considered by the *Boumediene* Court. Nevertheless,

*Boumediene* provides some guidance. While the magistrate's determination of a detainee's extraditability seems to be a proceeding of the kind *Boumediene* held warrants minimal review, the torture determination is much more like the closed proceedings, which *Boumediene* held should be subject to somewhat more searching review.

In particular, the regulations governing the Secretary of State's review of CAT claims in the extradition context are vague. It is difficult for me to determine from those regulations precisely what administrative process might be available to those claiming they are likely to be tortured if extradited. The regulations state:

> (a) . . . . In each case where allegations relating to torture are made or the issue is otherwise brought to the Department's attention, appropriate policy and legal offices review and analyze information relevant to the case in preparing a recommendation to the Secretary as to whether or not to sign the surrender warrant.

> (b) Based on the resulting analysis of relevant information, the Secretary may decide to surrender the fugitive to the requesting State, to deny surrender of the fugitive, or to surrender the fugitive subject to conditions.

22 C.F.R. § 95.3.

The risk of error in the Secretary's torture determination is likely lower than that of a CSRT tribunal—the determination is not accusatorial, nor is it likely (in general) to be directly affected by the national security concerns that underlie the CSRT determinations. It is, however, a closed process without a neutral decisionmaker. And it lacks, it would seem, any prescribed way for the detainee to present evidence or to contest

that presented by the government.[8] Furthermore, the consequence of error—torture—is indisputably significant, indistinguishable in terms of magnitude of harm, I would suggest, from indefinite detention. The Secretary's determination, then, is much more like the kind of proceeding *Boumediene* characterized as requiring habeas review with "the means to correct errors" than one for which "habeas corpus review may be more circumscribed." *Id.* at 786.

I would hold, therefore, that in reviewing the Secretary's determination that an individual may be extradited consistent with CAT, a habeas court must be able to inquire in some manner into the substance of the determination to "assess the sufficiency" of the Secretary's evidence and conclusions. *Id.* That is, on habeas review, the court must be able to assess whether the Secretary appropriately determined that, upon extradition, torture is not more likely than not. A declaration by the Secretary (or her delegate) such as the majority requires on due process grounds, stating than that the State Department determined that a detainee may be extradited consistent with CAT may be, but is not necessarily, sufficient for that purpose. Whether it is or not depends, in my view, on what the remainder of the record shows with regard to the likelihood of torture upon extradition.

This scaled approach flows from the recognition that judicial review of the Secretary's substantive determination should be extremely deferential. As the Government argues, the State Department is better suited than the courts to determine in the first instance the likelihood of torture and to nego-

---

[8]The Government states that "Trinidad was given multiple opportunities to submit any material he desired to the State Department to support his claim" and that "he was further offered an opportunity to present evidence at an in-person meeting with a State Department official." However, the Government also states that Trinidad "had no right to . . . a hearing," and, indeed, under the State Department regulations, it would seem that individuals claiming they are likely to face torture have no prescribed rights at all.

tiate with foreign governments to decrease that likelihood. Furthermore, the sensitivity of the foreign policy concerns implicated in extradition decisions requires that courts tread lightly in these cases. I do not take lightly the State Department's concerns about judicial review of its torture determinations. *Cf. Alperin v. Vatican Bank*, 410 F.3d 532, 556 (9th Cir. 2005) (stating that the State Department's views on whether a lawsuit implicated the political question doctrine would be taken into consideration in deciding whether to exercise judicial review). I would address these concerns, however, not by refusing judicial review entirely and in all circumstances, but rather by ensuring that the procedure by which we review the Secretary's torture determination is designed to take these considerations quite specifically into account. In addition, while judicial review of the Secretary's torture determination ought generally to be available, nothing would foreclose the State Department from arguing in any particular case that under the specific circumstances of that case, we ought to decline review. *Cf. Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004) ("[W]hile we reject the United States' recommendation to bar application of the FSIA to claims based on pre-enactment conduct, nothing in our holding prevents the State Department from filing statements of interest suggesting that courts decline to exercise jurisdiction in particular cases implicating foreign sovereign immunity.").

I therefore turn to the four considerations the Government maintains militate against judicial review of the Secretary's torture determinations. First, the Government explains that to ensure an extraditee will not be tortured, the State Department may seek assurances to that effect from a foreign government, impose conditions on extradition, and in some cases, monitor the extraditee's treatment once in the foreign country. *See Mironescu*, 480 F.3d at 671-72; *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997); *Emami v. Dist. Court*, 834 F.2d 1444, 1454 (9th Cir. 1987); *Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980); Semmelman, *supra*, at 1198. Arranging for these concessions, the Government argues, is a sensitive

and delicate process. And their very existence may be confidential.

No doubt, judicial review of the Secretary's torture determinations will sometimes require courts to deal with sensitive information. But we have well-developed mechanisms for dealing with such information, such as *in camera* review, protective orders, and procedures for reviewing classified information. *See Mironescu*, 480 F.3d at 673; *Quinn v. Robinson*, 783 F.2d 776, 788 (9th Cir. 1986); *Eain v. Wilkes*, 641 F.2d 504, 514-15 (7th Cir. 1981); *see also Boumediene*, 553 U.S. at 796; Classified Information Procedures Act, Pub. L. No. 96-456, 94 Stat. 2025 (1988) (describing procedures for use of classified information in criminal proceedings); FED. R. CIV. P. 5.2 (describing procedures for protective orders and filing documents under seal); FED. R. APP. P. 27-13 (describing procedures for filing sealed documents federal courts of appeals); Robert Timothy Reagan, *The New "Public Court": Classified Information in Federal Court*, 53 VILL. L. REV. 889 (2008) (describing procedures for use of classified information in recent federal civil and criminal proceedings).

I note that this is not a case in which the Government alleges that the relevant information is classified or that it is a state secret, the release of which is likely to affect national security. If the information were in either category, the Government could invoke established procedures for ensuring secrecy and, in the case of state secrets, our well-developed caselaw protecting such information (including providing for dismissal of cases in which a state secret is the subject of the proceeding or in which the case cannot go forward without information subject to the state secret evidentiary privilege). *See, e.g.*, *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070 (9th Cir. 2010). This case, and I expect most similar cases, involves information that implicates our diplomatic relations with other countries, but not, as far as we have been made aware, the security of our nation. While maintaining the

confidentiality of this information is essential, I have no doubt of courts' ability to do so through appropriate procedures.

Second, the Government emphasizes the importance of timeliness in extradition proceedings. Delay can impede our relationships with requesting nations and may even cause some cases to become moot as statutes of limitations run out. This is a legitimate concern, one that, as in other cases in which timeliness is important, courts can address by implementing expedited procedures where requested to do so and where appropriate. Given the availability of expedition, the Government's legitimate interest in timeliness cannot outweigh Trinidad's right to habeas relief if his extradition would result in torture, and therefore be contrary to law. *See Mironescu*, 480 F.3d at 673.

Third, the Government questions the ability of courts to determine whether an individual is more likely than not to be tortured. The Government explains:

> It is difficult to contemplate how judges would reliably make such a prediction, lacking any ability to communicate with the foreign government or to weigh the situation there, including the bilateral relationship with the United States, with resources and expertise comparable to those of the Department of State.

But judges routinely review such determinations. In the immigration context, courts frequently review claims that an individual, if removed, is likely to be tortured and therefore is entitled to withholding or deferral of removal under CAT and the FARR Act. *See, e.g.*, *Delgado v. Holder*, 648 F.3d 1095, 1108 (9th Cir. 2011) (en banc); *Al-Saher v. INS*, 268 F.3d 1143, 1146 (9th Cir. 2001). The adjudication of these claims sometimes involves the assessment of diplomatic assurances of the kind that also may be negotiated in extraditions. *See Khouzam v. Att'y Gen.*, 549 F.3d 235 (3d Cir. 2008). There

is no reason to think courts would suddenly become less competent in reviewing torture determinations simply because they were made in the context of extradition rather than immigration.

Pointing to several "obvious distinctions" between immigration and extradition, the Government argues that judicial competence to review torture determinations in immigration proceedings does not in fact indicate a similar competence in the extradition context. In particular, the Government argues that extradition treaties are negotiated "with foreign state partners meeting human rights norms," and that "an ongoing relationship with a specific foreign state creates incentives to meet human rights commitments in extradition situations." Given this observation, I am willing to accept that torture is less likely in the extradition than in the immigration context. But this assumption, while strongly bearing on the showing that a detainee must make in the face of a governmental declaration of FARR Act compliance such as the one the majority requires, does not justify *complete* displacement of all judicial authority with regard to substantive FARR Act enforcement in a habeas case.

Finally, the Government also seeks to distinguish the immigration cases based on the foreign policy implications of extradition. The Government explains that unlike immigration proceedings, extradition commences at the request of a foreign state, which commits substantial resources to the proceeding. And unlike immigration proceedings, extradition obligations are reciprocal: that is, just as the United States has agreed to extradite those who have committed crimes in certain countries, we depend on those countries to extradite individuals who have committed crimes here. If we fail to fulfill our extradition obligations, it is likely that when we request extradition, other countries will fail to fulfill their obligations.

These concerns, too, are legitimate and significant. But they are largely concerns relevant to *whether* the United

States ought to extradite an individual likely to face torture, a decision that, in ratifying CAT and passing the FARR Act, Congress has already made. They do not concern the difficulty or nature of the determination of whether torture is likely. This determination is the same regardless of whether the United States government has instigated a person's removal or a foreign government has requested it.

In the end, the Government has not identified a single way in which the actual determination of whether a person is likely to be tortured *fundamentally* differs in the extradition context from that in the immigration context—let alone differs in such a way that would make courts uniformly inept in reviewing such determinations in the extradition context although uniformly competent where immigration removal is at issue.

To be sure, the State Department has experience, expertise, and diplomatic tools that courts lack. It is for this reason that I suggest that our review here, even more than our review in the immigration context, ought to be highly deferential. But the State Department's comparative advantage in ascertaining the likelihood of torture, and in negotiating with foreign governments to ensure against torture in particular cases, does not mean that courts ought not *ever* review the Department's decisions to ensure that Executive detention is in accordance with the law, which is what the majority holds. "Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations . . . , it most assuredly envisions a role for all three branches when individual liberties are at stake." *Hamdi v. Rumsfeld*, 542 U.S. at 536; *see Khouzam*, 549 F.3d at 250; *United States v. Decker*, 600 F.2d 733, 738 (9th Cir. 1979) ("We are less inclined to withhold review when individual liberty . . . is implicated.").

Given all these considerations, I would structure a habeas proceeding such as this one to minimize the burden on the State Department, to protect its legitimate interest in conducting foreign affairs, to reveal diplomatic information even to

courts only when essential and when not protected by otherwise applicable doctrines, and to defer to its competence in that arena. We should therefore apply a highly deferential, limited inquiry principle to CAT claims in the extradition context, even more deferential than in the immigration context. In other words, at most, we would reverse the decision of the Secretary of State "only if the evidence is so compelling that no reasonable fact finder could have failed to find the requisite likelihood of torture." *Lanza v. Ashcroft*, 389 F.3d 917, 936 (9th Cir. 2004) (quoting *Singh v. Ashcroft*, 351 F.3d 435, 442 (9th Cir. 2003)). The detainee would bear the burden of demonstrating through strong, credible, and specific evidence that torture is more likely than not, and that no reasonable factfinder could find otherwise. If, and only if, such a prima facie case is made, must the Secretary submit evidence, should she so choose and *in camera* where appropriate, demonstrating the basis for her determination that torture is not more likely than not.

It is premature in this case to spell out the applicable standards in any greater detail, given that, as I stated at the outset, we do not even know whether the minimal procedural due process requirement adopted by the majority has been met. I can observe that in this case, Trinidad has made a very strong showing that his co-defendants were tortured. But the record also demonstrates that the Philippine judicial system so recognized, and that the prosecutions of the co-defendants therefore did not proceed. Under those circumstances, Trinidad would have to provide strong, credible, and specific evidence that he would be tortured if extradited *even though* the torture of his co-defendants made it impossible to prosecute them legally in the Philippines. I doubt the record as it stands is adequate for that purpose, and so I doubt that under my approach the government in the end would have to provide any more evidence than that the majority requires.

\*\*\*\*

Habeas corpus has long been a vital mechanism for preserving the separation of powers and individual liberty. Where international interests are implicated, habeas review can implicate serious foreign affairs and separation of powers concerns. But the judiciary cannot abandon its role in preventing unlawful detention by the Executive because asserting it responsibly is not easy. Rather, where possible, we must find ways of fulfilling our obligation while addressing the executive branch's legitimate concerns. I believe it is possible to do so in this case. The limited inquiry review I suggest above would both maintain the prerogative of the Secretary of State in conducting foreign affairs, particularly with regard to negotiations surrounding extradition, and avoid abdicating our role in preventing unlawful executive detention.

I concur in the majority's remand to the district court for the purpose it states. If the requisite declaration is provided, I would direct the district court to conduct proceedings consistent with this opinion.

---

PREGERSON, Circuit Judge, concurring in part and dissenting in part, with whom Judge W. Fletcher joins:

I agree with the majority's holding in all aspects, except parts 4-6. Specifically, I agree that we have jurisdiction to decide Trinidad y Garcia's habeas corpus petition. Per curiam at 6399-6401. I disagree with the majority opinion, however, regarding the scope of our review.

The majority believes that under the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), 8 U.S.C. § 1231[1] (congressional legislation implementing our obliga-

---

[1] Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-761, 2682-822-823 (1998) (codified as a note to 8 U.S.C. § 1231 (1991)).

tions under Article 3 of the Convention Against Torture (CAT)), "[a]n extraditee . . . possesses a narrow liberty interest: that the Secretary comply with her statutory and regulatory obligations." Per curiam at 6401. I believe, however, that Trinidad y Garcia's liberty interest is not merely about process. FARRA § 2242(a) unequivocally states that it is "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture[.]" 8 U.S.C. § 1231. Because Trinidad y Garcia has made a non-frivolous claim that "there are substantial grounds for believing [he] would be in danger of being subjected to torture" if he is extradited to the Philippines, in violation of FARRA § 2242(a) and CAT, and thus in violation of the "laws or treaties of the United States," 28 U.S.C. § 2241(c)(3), he has stated a cognizable habeas corpus claim in which he is entitled to meaningful review.

Thus, I disagree with the majority that Trinidad y Garcia's liberty interest will be fully vindicated if the Secretary of State augments the record with a declaration "signed by the Secretary or a senior official properly designated by the Secretary" attesting that the Secretary has complied with her regulatory obligations. Per curiam at 6402. Supreme Court precedent counsels otherwise: where we have found habeas jurisdiction, our review consists of "some authority to assess the sufficiency of the Government's evidence[.]" *Boumediene v. Bush*, 553 U.S. 723, 786 (2008). Because such a bare bones declaration from "the Secretary or a senior official properly designated by the Secretary," per curiam at 6402, does not allow us to "assess the sufficiency of the Government's evidence," *Boumediene*, 533 U.S. at 786, I cannot join the majority opinion and therefore dissent.

The stakes in this case could not be higher:

> [T]he right to be free from official torture is fundamental and universal, a right deserving of the highest

> stature under international law, a norm of *jus cogens.*
> The crack of the whip, the clamp of the thumb
> screw, the crush of the iron maiden, and, in these
> more efficient modern times, the shock of the elec-
> tric cattle prod are forms of torture that the interna-
> tional order will not tolerate. To subject a person to
> such horrors is to commit one of the most egregious
> violations of the personal security and dignity of a
> human being.

*Hilao v. Estate of Marcos,* 25 F.3d 1467, 1475 (9th Cir. 1994) (quoting *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992)). This international norm pro- hibiting torture has been adopted by 149 countries[2] that are parties to the CAT.[3] Article 3 of CAT requires that a State Party not return a person to another State where there are "substantial grounds for believing that he would be in danger of being subjected to torture." The United States signed CAT, and the Senate ratified the treaty with certain provisions, including that "the terms of CAT were not affected, except that the 'substantial grounds for believing' basis was clarified to mean 'if it is more likely than not that he would be tor- tured.' " *Edu v. Holder*, 624 F.3d 1137, 1144 (9th Cir. 2010) (citing 136 Cong. Rec. S17486, S17492 (1990)). Congress implemented our CAT obligations in the FARRA stating clearly that it is "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture," FARRA § 2242(a).

---

[2]1465 U.N.T.S. 85.

[3]United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, adopted by unanimous agreement of the U.N. General Assembly, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51 at 197, U.N. Doc. A/RES/39/708 (1984), entered into force as to the United States Nov. 20, 1994, signed Apr. 18, 1988.

Trinidad y Garcia alleged that his extradition to the Philippines violates FARRA and CAT, and presented compelling evidence that "there are substantial grounds for believing [he] would be in danger of being subjected to torture" if the United States transferred him to the Philippines. FARRA § 2242(a). Specifically, Trinidad y Garcia presented credible evidence in the form of affidavits and court documents from the Philippines revealing that the Philippine government tortured almost all of his co-accused, and numerous authoritative country reports detailing how Philippine law enforcement officials continue to torture and abuse suspects.

The Philippines sought Trinidad y Garcia's extradition to stand trial on a charge of kidnaping for ransom. Five of Trinidad y Garcia's co-accused were tortured by the Philippine government. The treatment of two of these co-accused, Gerilla and Villaver, is especially troubling. According to Gerilla's sworn affidavit, police officers abducted him from his home, blindfolded him, secluded him in a small, cold room, and denied him food and water. When Gerilla denied the Phillippine officials' charges against him, the police officers placed a plastic bag over Gerilla's head, causing him to suffocate; the officers removed the bag at the last minute. The Philippine police officers poured soft drinks down Gerilla's nose, making it hard for him to breathe, and then forced him to eat a foul-tasting substance, causing him to vomit. As Gerilla continued to maintain his innocence, the officers affixed electric wires to Gerilla's inner thighs, shocking him with electricity, and then forced him to endure extreme temperatures by shoving ice down his shirt. Eventually Gerilla confessed to the charges against him after the officers threatened to abduct and rape his sisters. A Philippine trial judge found this account of torture credible, deemed Gerilla's extrajudicial confession invalid and inadmissible, and dismissed all the charges against him.

Trinidad y Garcia also presented an affidavit from another co-accused, Villaver, who similarly endured physical torture,

including suffocation and electric shocks. When Villaver refused to confess to any crime, Philippine officers took him to a remote rice paddy, removed his restraints, and told him, "Do something to save your life, it is all up to you." When Villaver attempted to run, the officers shot him twice in the back and another bullet grazed his chin. Instead of taking Villaver to a hospital, the officers put him into their jeep and began suffocating him by holding a piece of plastic with cloth over Villaver's nose. While suffocating, Villaver lost bodily control, causing him to defecate. Eventually, the officer released the pressure on Villaver's nose and mouth. The officers took Villaver to a hospital where doctors performed emergency surgery. Villaver survived.

In addition to these specific and credible accounts of torture Trinidad y Garcia's co-accused suffered at the hands of Philippine officials, Trinidad y Garcia presented numerous supporting documents demonstrating the pervasiveness of torture in the Philippines. The State Department's 2007 country report for the Philippines — a report prepared by the Secretary's own agency — states, "members of the security forces and police were alleged to have routinely abused and sometimes tortured suspects and detainees." According to Amnesty International's 2003 country report for the Philippines, "torture persists." "Techniques of torture documented by Amnesty International include electro-shocks and the use of plastic bags to suffocate detainees." The report finds that "a continuing *de facto* climate of impunity that shields the perpetrators of torture and other grave human rights violations" exists in the Philippines.

Trinidad y Garcia presented his CAT claim to the Secretary of State. But despite this evidence, Secretary of State Condoleeza Rice authorized a warrant to surrender Trinidad y Garcia for extradition on September 12, 2008. Trinidad immediately filed a request to stay the extradition pending the resolution of a habeas corpus petition, which the district court granted. On November 24, 2009, Trinidad filed a writ of

habeas corpus under 28 U.S.C. § 2241, alleging that he was being unlawfully detained pending extradition under the Secretary of State's surrender warrant because he was denied procedural due process, and because his extradition will violate CAT and federal law, and deny him his substantive due process rights. The Secretary of State refused to provide the district court with any evidence for it to review the Secretary's decision to surrender Trinidad y Garcia for extradition. Because of Trinidad y Garcia's compelling unrebutted evidence of the likelihood of torture, the district court granted Trinidad y Garcia's habeas petition.

In reviewing Trinidad's habeas claim and the compelling evidence he submitted, the majority believes all that is required of the State Department is a declaration from the Secretary "or a senior official properly designated by the Secretary" attesting that the Secretary considered Trinidad y Garcia's torture claim and found it not "more likely than not" that he would face torture if returned to the Philippines. Per curiam at 6400-02. But such a superficial inquiry in the context of a habeas corpus petition abdicates the critical constitutional "duty and authority" of the judiciary to protect the liberty rights of the detained by "call[ing] the jailer to account." *Boumediene*, 553 U.S. at 745.

In *Boumediene*, a case involving a habeas challenge by prisoners held as "enemy combatants" at the Guantanamo Bay detention camp, the Supreme Court explained that "[w]here a person is detained by executive order, rather than say, after being tried and convicted in a court, the need for collateral review is most pressing." 553 U.S. at 783. The Court explained that while habeas proceedings challenging detention by executive order do not need to contain the same procedures as a criminal trial, "the writ must [nevertheless] be effective." *Id.* The Court explicitly noted that "[i]t is uncontroversial . . . that the habeas privilege entitles the prisoner to a *meaningful* opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of rel-

evant law." *Id.* at 728-29 (emphasis added) (citing *INS v. St. Cyr,* 533 U.S. 289, 302 (2001)). Accordingly, the Court was clear that "[f]or the writ of habeas corpus, or its substitute, to function as an effective and proper remedy in this context, the court that conducts the habeas proceeding must have the means to correct errors that occurred during the [earlier proceedings.]" *Id.* at 786. "This includes some authority to assess the *sufficiency* of the Government's evidence against the detainee." *Id.* (emphasis added).

But all we have here is a black box because the Secretary has refused to present to the district court *any* evidence she considered in deciding to surrender Trinidad y Garcia to the Philippines. The majority's requirement that the Secretary or her designee only produce an affidavit declaring that the Secretary determined it is not "more likely than not" that Trinidad y Garcia will suffer torture if extradited to the Philippines does not allow the district court to conduct a meaningful habeas proceeding. *See id.* Such a document does not allow the district court "to assess the *sufficiency* of the Government's evidence against the detainee," nor does it provide the district court an opportunity to "correct errors that occurred during the [earlier proceedings]," as habeas corpus review requires. *Id.* (emphasis added).

I disagree with the majority that *Munaf v. Geren,*[4] 553 U.S.

---

[4]*Munaf* cannot be read to supersede the holding or underlying reasoning in *Boumediene*. Both cases were decided in the same year, 2008. Nor are the stakes arguably higher in *Munaf* than *Boumediene*, which involved significant national security matters. The Supreme Court noted in *Boumediene* that even in such high stakes circumstances, it is critical for the courts to properly adjudicate habeas claims:

> In considering both the procedural and substantive standards used to impose detention to prevent acts of terrorism, proper deference must be accorded to the political branches. . . . Officials charged with daily operational responsibility for our security may consider a judicial discourse on the history of the Habeas Corpus Act

674 (2008), and the Rule of Non-Inquiry prevent us from performing our constitutional duty of "inquir[ing] into the substance of the Secretary's decision." Per curiam at 6402.

The majority appears to cite *Munaf* for the proposition that an executive decision to surrender a detainee accused of committing crimes in another country should be addressed solely by the executive. But *Munaf* is readily distinguishable from the present case. The facts of *Munaf* are unique and the Supreme Court was clear that its holding was circumscribed to the circumstances of that case. *See* 553 U.S. at 700 ("[I]n the *present context* [petitioner's concerns of torture are] to be addressed by the political branches[.]" (emphasis added)); *see also id.* at 706 (Souter, J., concurring) (stating that "[t]he Court holds that 'under circumstances such as those presented here . . . habeas corpus provides petitioners with no relief' " and explicitly outlining the unique circumstances of the case). In *Munaf,* petitioners were two U.S. citizens who were captured in Iraq and held by U.S. military forces in Iraq, at the request of the Iraqi government, pending prosecution in Iraqi courts for crimes they allegedly committed while in Iraq during ongoing hostilities. *Id.* at 681-85. Such circumstances require the courts to "adjudicat[e] issues inevitably entangled in the conduct of our international relations[,]" and the Court therefore approached the issues "cognizant that courts traditionally have been reluctant to intrude upon the authority of

---

of 1679 and like matters to be far removed from the Nation's present, urgent concerns. . . . Security depends upon a sophisticated intelligence apparatus and the ability of our Armed Forces to act and to interdict. There are further considerations, however. Security subsists, too, in fidelity to freedom's first principles. Chief among these are freedom from arbitrary and unlawful restraint and the personal liberty that is secured by adherence to the separation of powers. It is from these principles that the judicial authority to consider petitions for habeas corpus relief derives.

553 U.S. at 796-97.

the Executive in military and national security affairs." *Id.* at 689 (internal quotation marks omitted). Further, the petitioners in *Munaf* were not seeking simple release: if they were released in Iraq, they would likely be arrested by Iraqi forces, the very event they were seeking to avoid. *Id.* at 692. Thus, the *Munaf* petitioners sought "transfer" to another country where they believed they would not suffer torture. *Id.* The Court noted that this requested relief did not present a proper habeas claim: "the 'release' petitioners seek is nothing less than an order commanding our forces to smuggle them out of Iraq." *Id.* at 697.

In contrast, Trinidad y Garcia is in the United States and seeks the proper form of habeas "release," as opposed to the "transfer" petitioners sought in *Munaf*. Further, Trinidad y Garcia has made an individualized claim of torture based on official documents from Philippine courts and reports by the State Department — the very department that now refuses to account for its extradition decision — regarding the pervasiveness of torture in the Philippines. Such a claim hardly "intrude[s] upon the authority of the Executive in military and national security affairs." *Id.* at 689 (internal quotation marks omitted). Moreover, adjudication of FARRA torture claims cannot possibly involve "issues inevitably entangled in the conduct of our international relations[,]" because federal courts routinely adjudicate torture claims as part of our review of immigration proceedings. *Id.* (internal quotation marks omitted); *See, e.g.*, *Khouzam v. Attorney Gen. of the United States*, 549 F.3d 235, 253 (3d Cir. 2008) ("In fact, we routinely evaluate the justice systems of other nations in adjudicating petitions for review of removal orders.").

Moreover, the Supreme Court explicitly stated in *Munaf* that it "express[ed] no opinion" on whether habeas relief was available if a petitioner asserted a claim that his extradition would violate the Secretary's obligations under FARRA. 533 U.S. at 703 & n.6. ("Neither petitioner asserted a FARR Act claim in his petition for habeas, and the Act was not raised in

any of the certiorari filings before this Court. . . . Under such circumstances we will not consider the question."); *see also id.* at 706 (Souter, J., concurring) ("I would add that nothing in today's opinion should be read as foreclosing relief for a citizen[5] of the United States who resists transfer . . . in which the probability of torture is well documented, even if the Executive fails to acknowledge it."); *see also Khouzam*, 549 F.3d at 254 (finding that the principles of *Munaf* did not apply to a FARRA claim because the Supreme Court "expressly distinguished claims under CAT"). In contrast, Trinidad y Garcia's habeas claim alleges that his extradition will violate his constitutional rights not to be transferred in violation of a federal law, FARRA, and the U.S.'s treaty obligations under CAT, and presented numerous documents that show there is a substantial likelihood he will be tortured if returned to the Philippines. Thus, because Trinidad y Garcia's case is so readily distinguishable from the unique circumstances of *Munaf* and the Court in *Munaf* explicitly reserved for another day the decision of whether its holding would apply to a legitimate FARRA claim, I do not believe that *Munaf* limits our review to the extent the majority believes it does.

The Rule of Non-Inquiry similarly does not limit the scope of our review to such a superficial level as the majority suggests. The Rule of Non-Inquiry is a rule the courts imposed on themselves to preserve "Executive discretion." *Emami v. United States Dist. Court*, 834 F.2d 1444, 1454 (9th Cir. 1987); *Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005) (noting that "the rule of non-inquiry is based on . . . the Secretary of State's exercise of discretion"). But the Secretary's obligation not to extradite someone who will "more

---

[5]That Trinidad y Garcia is not a citizen of the United States is irrelevant. FARRA does not distinguish between citizens and non-citizens, *see* FARRA § 2242(a), nor does such a distinction matter for a due process claim, *see Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens[.]").

likely than not" face torture is a *nondiscretionary* duty under FARRA, as State Department counsel conceded in briefing and at oral arguments. Accordingly, proper habeas review exists for Trinidad y Garcia to challenge whether he is being held because of "the erroneous application or interpretation of relevant law." *Boumediene*, 553 U.S. at 729 (internal quotation marks omitted).

*Munaf* and the Rule of Non-Inquiry therefore do not remove all substantive review of the Secretary's decision to surrender an extraditee when he has presented a non-frivolous FARRA claim that it is "more likely than not" he will suffer torture when transferred to the requesting country. However, the underlying principles of *Munaf* and the Rule of Non-Inquiry at least suggest that we do not have the sweeping authority to overturn the Secretary's decision simply because we disagree with it. Our review lies somewhere between these two extremes. A mere statement that the Secretary has complied with her duties is not enough under current precedent. In fact, the Supreme Court in *Boumediene* suggested as much when it rejected the government's arguments that the Combatant Status Review Tribunal (CSRT) provided sufficient process to substitute for the writ of habeas corpus:

> Although we make no judgment whether the CSRTs, as currently constituted, satisfy due process standards, we agree with petitioners that, even when all the parties involved in this process act with diligence and in good faith, there is considerable risk of error in the tribunal's findings of fact. This is a risk inherent in any process that, in the words of the former Chief Judge of the Court of Appeals, is "closed and accusatorial." And given that the consequence of error may be detention of persons for the duration of hostilities that may last a generation or more, this is a risk too significant to ignore.

553 U.S. at 785 (internal citation omitted). In Trinidad y Garcia's case, the decision by the Secretary of State to surrender him for extradition was entirely "closed" and the consequences of error here are significant: Trinidad y Garcia will suffer torture. For these reasons, I cannot accept as sufficient habeas process a letter from the Secretary that she properly followed State Department procedures in making her decision to extradite Trinidad y Garcia. *See also In re Burt*, 737 F.2d 1477, 1484 (7th Cir. 1984) ("We hold that federal courts undertaking habeas corpus review of extraditions have the authority to consider not only procedural defects in the extradition procedures that are of constitutional dimension, but also the substantive conduct of the United States in undertaking its decision to extradite if such conduct violates constitutional rights.").[6]

While the majority appears to believe that a substantive review of the Secretary's determination on Trinidad y Garcia's CAT claim violates our constitutional structure, I believe such review only strengthens our constitutional system of checks and balances, as well as the Great Writ of habeas corpus. The Supreme Court recognized as much in *Boumediene*:

---

[6]Like the Supreme Court in *Boumediene*, I make no judgment here about what the appropriate level of review should be in such cases:

> The extent of the showing required of the Government in these cases is a matter to be determined. We need not explore it further at this stage. We do hold that when the judicial power to issue habeas corpus properly is invoked the judicial officer must have adequate authority to make a determination in light of the relevant law and facts and to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release.

553 U.S. at 787. At a minimum, the "arbitrary and capricious" standard articulated in *Cornejo-Barreto v. Seifert*, 218 F.3d 1004 (9th Cir. 2000), would be appropriate. Therefore, I would not overrule this court's decision in *Cornejo* as the majority does. Per curiam at 6402.

> [T]he exercise of [the Executive's powers as Commander in Chief] is vindicated, not eroded when confirmed by the Judicial Branch. Within the Constitution's separation-of-powers structure, few exercises of judicial power are as legitimate or as necessary as the responsibility to hear challenges to the authority of the Executive to imprison a person.

553 U.S. at 797.

Finally, I fully acknowledge that there are serious and legitimate concerns in a case such as this regarding the protection of classified information. The district court has sufficient tools, such as in camera review and protective orders, to ensure that classified information is properly and effectively protected. *See e.g.*, *Khouzam*, 549 F.3d at 259 n.16 (suggesting a protective order regarding the disclosure of diplomatic assurances would ameliorate the government's "concern[ ] that public disclosure of certain information may jeopardize national security"). I do not feel the need, however, to circumscribe the district court at this point and believe that the district court will use its sound discretion to accommodate this important interest. *See Boumediene*, 553 U.S. at 796 ("We recognize, however, that the Government has a legitimate interest in protecting sources and methods of intelligence gathering; and we expect the District Court will use its discretion to accommodate this interest to the greatest extent possible. . . . These and other remaining questions are within the expertise and competence of the District Court to address in the first instance.").

Thus, for the reasons discussed above, I dissent from the majority's declaration that Trinidad y Garcia's liberty interest will be fully vindicated if the Secretary of State augments the record with the bare bones declaration the majority suggests.

Chief Judge KOZINSKI, dissenting in part:

**1.** The federal habeas statute, 28 U.S.C. § 2241, simultaneously provides jurisdiction to hear habeas petitions and remedies for successful ones. *See* Richard H. Fallon, Jr. & Daniel J. Meltzer, *Habeas Corpus Jurisdiction, Substantive Rights, and the War on Terror*, 120 Harv. L. Rev. 2029, 2038 (2007). Just because someone in custody files a document styled "habeas petition" doesn't mean a federal court has jurisdiction to entertain it. Instead, the petitioner must allege a type of claim cognizable on habeas. *Cf. Bell* v. *Wolfish*, 441 U.S. 520, 526 n.6 (1979) (relying on "an alternative basis for jurisdiction" to adjudicate claims whose cognizability on habeas review the Court found questionable); *Stone* v. *Powell*, 428 U.S. 465, 479-80 (1976) (discussing the connection between "claims . . . cognizable in [28 U.S.C.] § 2255 [habeas] proceedings" and "the substantive scope of federal habeas jurisdiction"). In the extradition context, habeas corpus isn't available to challenge just any aspect of the executive branch's authority an extraditee seeks to question. Rather, the case law—including our own opinion in *Cornejo-Barreto* v. *Seifert*, 218 F.3d 1004, 1009-10 (9th Cir. 2000)—makes clear that an extraditee may raise only certain claims on habeas.

Trinidad y Garcia fails to make out a claim cognizable on habeas by invoking the Convention Against Torture ("CAT") and alleging that, if extradited, he'll face torture at his destination. What's been historically cognizable on habeas review in the extradition context is (1) whether the executive branch has the authority to detain the extraditee in the first place and whether the judicial branch has exercised proper jurisdiction over him, all of which has already been litigated and resolved against Trinidad; (2) whether the executive is operating under a valid treaty authorizing extradition, which isn't disputed here; and (3) whether the extraditee's crime falls into the political offense exception, which Trinidad doesn't allege. *See, e.g., Fernandez* v. *Phillips*, 268 U.S. 311, 312 (1925)

("[In addition to] general principles relating to extradition, . . . there are further limits to habeas corpus. . . . [H]abeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty."); *Neely* v. *Henkel*, 180 U.S. 109 (1901); *Oteiza* v. *Jacobus*, 136 U.S. 330 (1890); *see also Cornejo-Barreto*, 218 F.3d at 1009-10 (discussing the limited categories of habeas review in the extradition context); John T. Parry, *The Lost History of International Extradition Litigation*, 43 Va. J. Int'l L. 93, 97 (2002) (same).

There's absolutely no authority supporting Trinidad's claim that habeas review is available to challenge the destination to which a detainee is to be extradited based on how he might be treated there. As the D.C. Circuit noted recently, "[t]hose facing extradition traditionally have not been able to maintain habeas claims to block transfer based on conditions in the receiving country. Rather, applying what has been known as the rule of non-inquiry, courts historically have refused to inquire into conditions an extradited individual might face in the receiving country." *Omar* v. *McHugh*, 646 F.3d 13, 19 (D.C. Cir. 2011). Trinidad doesn't identify a single case holding that an extraditee's challenge to the treatment he might receive at his destination is cognizable on habeas. He therefore fails to present a claim for which the federal habeas statute provides jurisdiction.

*INS* v. *St. Cyr*, 533 U.S. 289 (2001), on which my colleagues rely heavily in their various opinions, stands in marked contrast. St. Cyr challenged the executive's authority to continue to detain and then deport him. *Id.* at 293. The Court found abundant historical evidence that such a challenge was traditionally cognizable on habeas review. *Id.* at 305-10. There's no equivalent historical evidence supporting Trinidad's claim.

Also in contrast is *Munaf* v. *Geren*, 553 U.S. 674 (2008), where the Supreme Court found habeas jurisdiction to consider a challenge to petitioners' transfer based on the treatment they'd receive, then rejected that challenge on the merits. The only claims entertained in *Munaf* were constitutional ones. *Id.* at 703-04 n.6. In light of the understanding articulated in *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), that the Constitution itself provides jurisdiction to raise constitutional claims, it was relatively straightforward for the *Munaf* Court to find statutory habeas jurisdiction as a vehicle for raising constitutional claims. *See Munaf*, 553 U.S. at 685-88; *see also Martin* v. *Warden*, 993 F.2d 824, 829 (11th Cir. 1993) (explaining that, despite the circumscribed nature of judicial review in the extradition context, habeas review still allows consideration of "the constraints of the Constitution"). It's true that the Court has "constru[ed] broadly the power of a federal district court to consider constitutional claims presented in a petition for writ of habeas corpus." *Stone*, 428 U.S. at 478 n.11. But Trinidad's CAT claim is statutory and regulatory, not constitutional. And *Munaf* does *not* suggest there's statutory habeas jurisdiction for claims of this kind.

There's thus no need to assess the effect of the FARR Act, 8 U.S.C. § 1231 note, or the REAL ID Act, 8 U.S.C. § 1252(a)(4). Both statutes explicitly disavow any congressional intent to create jurisdiction for review of CAT claims outside a limited immigration context. *See Munaf*, 553 at 703 n.6. Because there's no statutory jurisdiction for Trinidad's challenge to begin with, these statutes serve only to confirm that absence of jurisdiction.

*St. Cyr* urged against "adopting a [statutory] construction that would raise serious constitutional questions" by "preclud-[ing] judicial consideration on habeas," 533 U.S. at 314, but recognizing our lack of jurisdiction here does no such thing. A serious constitutional question would arise only if we interpreted a statute to preclude the type of habeas review pro-

tected by the Constitution's Suspension Clause. U.S. Const. art. I, § 9, cl. 2. But, unlike St. Cyr, Trinidad doesn't present a claim implicating this type of habeas review, because his claim isn't cognizable on habeas. How Trinidad will be treated by the government of another country after he leaves the United States doesn't implicate any of his rights under the United States Constitution. In finding his challenge outside the bounds of the federal habeas statute, there's no judicial consideration to "preclude" and thus no constitutional problem to "avoid."

The per curiam thus rightly overrules *Cornejo-Barreto*, 218 F.3d at 1015-16, which held in the context of a CAT challenge to extradition that, "since potential extraditees meet the other requirements for habeas standing under 28 U.S.C. § 2241 (2000), a habeas petition is the most appropriate form of action for fugitives seeking review of the Secretary's extradition decisions." *Cornejo-Barreto* somehow found jurisdiction in the federal habeas statute via the Administrative Procedure Act ("APA"), 5 U.S.C. § 703. But, as *Cornejo-Barreto* itself acknowledged, "[t]he APA is not an independent grant of jurisdiction." *Cornejo-Barreto*, 218 F.3d at 1015 (citing *Califano* v. *Sanders*, 430 U.S. 99, 105 (1977)); *see* Jacques Semmelman, *International Decisions: Cornejo-Barreto v. Seifert*, 95 Am. J. Int'l L. 435, 438 (2001) ("[T]he APA does not provide a basis for authorizing judicial review of the secretary's decision to extradite."). Because there's no jurisdiction under the habeas statute, there can be no jurisdiction under the APA.

While, as in *Munaf*, we have jurisdiction to hear Trinidad's due process claim, I agree with the per curiam that the claim is foreclosed by *Munaf* itself, which found that identical claims in the transfer context "do not state grounds upon which habeas relief may be granted." *Munaf*, 553 U.S. at 692.

**2.** The per curiam offers little explanation for finding jurisdiction to entertain Trinidad's CAT claim, instead simply

asserting that "[t]he writ of habeas corpus historically provide[d] a remedy to non-citizens challenging executive detention." Per curiam at 6400. Judge Thomas's concurrence, while defending the exercise of jurisdiction at greater length, rests on the similar claim that "[f]ederal habeas relief under § 2241 is available as a remedy to non-citizens challenging executive detention" and therefore "provides an avenue of relief to persons, such as Trinidad y Garcia, who are challenging the legality of extradition proceedings." Thomas conc. at 6403. And Judge Tallman, whose discussion of jurisdiction is most extensive, ultimately relies on the analogous assertion that "Trinidad would historically have been entitled to habeas review of his claim to the extent he argues that the [CAT] or the FARR Act bind the authority of the Executive to extradite him." Tallman dissent at 6427.

All of these justifications suffer a fatal flaw: They characterize Trinidad's claim at too high a level of generality and therefore conflate Trinidad's particular claim with other claims that are cognizable on habeas review in the extradition context. It's far too broad to say, as Judge Tallman does, that Trinidad challenges "the authority of the Executive to extradite him." *Id.* Trinidad, in fact, challenges something very specific: the destination to which the executive seeks to extradite him, based on his potential treatment there. And Judge Tallman doesn't point to a single case showing that the scope of habeas review has ever been understood to encompass such a challenge because "[n]o court has yet denied extradition based upon the defendant's anticipated treatment in the requesting country." Jacques Semmelman, *Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings*, 76 Cornell L. Rev. 1198, 1218 (1991). As the Second Circuit has explained, "consideration of the procedures that will or may occur in the requesting country is not within the purview of a habeas corpus judge." *Ahmad* v. *Wigen*, 910 F.2d 1063, 1066 (2d Cir. 1990). That leaves Trinidad beyond the scope of habeas review—and, because the federal habeas statute predicates the exercise of

habeas jurisdiction on the existence of a cognizable habeas claim, that also leaves Trinidad beyond the scope of our habeas jurisdiction.

Judge Tallman's analysis leads to the same conclusion. On page 6419 of his opinion, he properly characterizes as *jurisdictional* the key language from *Oteiza*, 136 U.S. at 334:

> A writ of *habeas corpus* in a case of extradition cannot perform the office of a writ of error. If the commissioner has jurisdiction of the subject-matter and of the person of the accused, and the offense charged is within the terms of a treaty of extradition, and the commissioner, in arriving at a decision to hold the accused[,] has before him competent legal evidence on which to exercise his judgment as to whether the facts are sufficient to establish the criminality of the accused for the purposes of extradition, such decision of the commissioner cannot be reviewed by a circuit court or by this court, on *habeas corpus*, either originally or by appeal.

While he notes that judicial review of extradition has expanded since *Oteiza*, Judge Tallman rightly concludes that "the scope of our habeas review in the extradition context wholly depends on the will of Congress." Tallman dissent at 6420. By "the scope of our habeas review," he presumably still refers to "the habeas jurisdiction of reviewing courts" he mentioned a page earlier. So, when he ultimately—and, again, rightly—concludes that Trinidad's challenge falls outside the scope of our habeas review as intended by Congress, that also resolves the jurisdictional question. As one commentator writes about the exact language from *Oteiza* Judge Tallman quotes, "[t]he [Supreme] Court has repeatedly reaffirmed that these listed issues are the only ones within the scope of a court's authority on habeas corpus review of a finding of extraditability." Semmelman, *Federal Courts*, *supra*, at 1211.

Starting from a mistaken characterization of Trinidad's claim leads my colleagues to an equally mistaken conclusion about the role of the FARR and REAL ID Acts. Because they erroneously view habeas jurisdiction over Trinidad's claim as preexisting and presupposed, they ask the wrong question: whether these statutes have clearly "preclude[d]" or "repeal[ed]" such jurisdiction. Tallman dissent at 6422, 6427; Thomas conc. at 6405-06. But there was no habeas jurisdiction, whether statutory or constitutional, to preclude or repeal in the first place.

Consider *In re Metzger*, 46 U.S. (5 How.) 176 (1847). After receiving an extradition request, the President referred it to a district judge, who approved Metzger's extradition. Metzger then filed a habeas petition with the Supreme Court. The Court found that it had no jurisdiction to grant habeas relief. Its reasoning was somewhat technical—the district judge had been acting in chambers rather than exercising Article III judicial power—but the result is instructive for our case: The Court saw no constitutional problem whatsoever in finding the absence of any jurisdiction, whether appellate or original, over Metzger's habeas petition challenging his extradition. *Id.* at 191-92. That's because extraditees have no free-floating right to challenge their extradition via habeas petition. If an extraditee isn't challenging one of the few issues deemed by Congress to be suitable for judicial inspection, a federal court lacks jurisdiction over the challenge—and that raises no constitutional problem.

Judge Tallman is quite right that, in *Valentine* v. *United States ex rel. Neidecker*, 299 U.S. 5 (1936), the Supreme Court "expressed no hesitation in *reviewing* . . . [the extraditees'] claims under its habeas power." Tallman dissent at 6415 n.3. But that's because the *Valentine* extraditees' challenge fell squarely within the second traditional category of habeas review of extradition set out above: whether the executive branch was operating under a valid treaty authorizing the extradition in question. Here's how the *Valentine* Court

framed the issue before it: "The question, then, is the narrow one whether the power to surrender the respondents in this instance is conferred by the treaty itself." *Valentine*, 299 U.S. at 10. That question fell right in the sweet spot of traditional extradition habeas review, but it's light-years away from Trinidad's challenge. Judge Tallman's heavy reliance on *Valentine* is entirely misplaced, leaving him with no support for his newfangled theory.

More fundamentally, Judge Tallman criticizes my "cabining of Trinidad's claim as strictly statutory or regulatory." Tallman dissent at 6415 n.3. That's not *my* characterization of Trinidad's CAT claim—it's Trinidad's. In his brief before this court, he refers to his "statutory torture claim" and the "federal statutory mandate" on which it relies. So, unlike the question of "constitutional *authority*" at issue in *Valentine*, *id.* (quoting *Valentine*, 299 U.S. at 6, with emphasis added by Judge Tallman), here we face an explicitly statutory and regulatory challenge. That distinguishes the jurisdictional issue in this case from *Valentine*—and, as I've already discussed, from *Munaf*, too. *See* pp. 6497-98 *supra*.

As Judge Tallman acknowledges, Tallman dissent at 6423 n.8, his approach produces a circuit split, even as he relies selectively on other circuits to bolster his conclusion. He portrays his position as consistent with the First and Second Circuits in finding that the FARR Act doesn't "bar habeas review." *Id.* at 6423 (citing *Saint Fort* v. *Ashcroft*, 329 F.3d 191, 200-02 (1st Cir. 2003); *Wang* v. *Ashcroft*, 320 F.3d 130, 140-42 (2d Cir. 2003)). But both of those circuits were deciding immigration cases, not extradition cases; and, in the extradition context, there's no preexisting "habeas review" to "bar." Meanwhile, Judge Tallman casually lists as contrary authority the Fourth Circuit's decision in *Mironescu* v. *Costner*, 480 F.3d 664, 674 (4th Cir. 2007), tossing it aside because "the Fourth Circuit explicitly disclaimed any consideration of the Suspension Clause's effect," Tallman dissent at 6423 n.8. But, as I've explained, the Suspension Clause *has*

no effect here, because there's no preexisting habeas review available to Trinidad that the FARR or REAL ID Acts might "suspend."

So, Judge Tallman's approach—and the approach of my colleagues in finding jurisdiction for Trinidad's CAT claim—splits with the Fourth Circuit, all on the grounds that the Fourth Circuit didn't consider the effect of a constitutional provision that plainly has no bearing on our case. Not only does this approach create a split with the Fourth Circuit on extradition, it also splits with the D.C. Circuit, which embraced the Fourth Circuit's understanding in a decision on detainee transfers abroad. *See Omar*, 646 F.3d at 18 (citing *Mironescu*, 480 F.3d at 674-76).

**3.** I note the thoughtful views of our colleague on the D.C. Circuit, Judge Griffith, on similar issues that have confronted his court. Starting in *Kiyemba* v. *Obama* (*Kiyemba II*), 561 F.3d 509 (D.C. Cir. 2009), Judge Griffith has asserted in the context of detainee transfers "that jurisdiction to hear the petitioners' claims against unlawful transfer—a fundamental and historic habeas protection—is grounded in the Constitution." *Id.* at 523-34 (Griffith, J., dissenting in part). What concerned Judge Griffith in *Kiyemba II* was very different from what's before our court: He addressed whether the transfer of the prisoners "will result in continued detention on behalf of the United States in a place where the writ does not run." *Id.* at 525. Judge Griffith's concern that the United States would maintain control over the prisoners while evading judicial review doesn't apply to our case, where the United States seeks to extradite Trinidad and relinquish all control over him. Trinidad doesn't allege otherwise—indeed, his motivating concern is precisely that he'll be mistreated once he's no longer in American custody and instead in Filipino hands.

Judge Griffith expanded on his earlier position with his dissental in *Abdah* v. *Obama*, 630 F.3d 1047 (D.C. Cir. 2011). In support of his assertion of "the long-established right of a

prisoner to question his jailer's authority to transfer him to a place where it would be difficult or impossible to execute the writ," Judge Griffith provides the history of habeas challenges to the executive transferring a prisoner beyond the writ's reach in order to evade habeas jurisdiction. *Id.* at 1048 (Griffith, J., dissental). None of his examples, however, involves extradition, in which the executive transfers a prisoner abroad, not to evade habeas review, but to deliver him pursuant to an extradition treaty to a country seeking to prosecute him for crimes he allegedly committed there. Judge Griffith's examples of American colonial state laws demonstrate an extradition exception to the general prohibition on transfers and, accordingly, an exception to the reviewability of such transfers via habeas petition. *Id.* at 1051.

Most recently, Judge Griffith concurred in *Omar*, 646 F.3d 13, where he "disagree[d] with the majority's suggestion that we have no jurisdiction to consider [the transferee's] claim" because "the Constitution's guarantee of habeas corpus entitles him to assert any claim that his detention or transfer is unlawful." *Id.* at 25 (Griffith, J., concurring in the judgment). Judge Griffith thus finds constitutional habeas jurisdiction to hear CAT claims. But his assertion that there's constitutional habeas jurisdiction for "any claim" of unlawful detention or transfer suffers from the same flaw that afflicts the analysis of Judges Thomas and Tallman here: It's too broad. Centuries of extradition case law have carved out the specific types of challenges an extraditee may raise on habeas review. To say an extraditee can find jurisdiction in the federal habeas statute to raise "any claim" would be a radical departure from those centuries of unbroken precedent.

**4.** While federal habeas jurisdiction is enshrined in a federal statute, the writ of habeas corpus remains a common law writ. And, like all creatures of the common law, it can and should evolve over time. What yesterday may have failed to qualify as a cause of action seeking habeas relief may qualify tomorrow. Because, in the habeas context, a cause of action

and the jurisdiction to hear it are inextricably linked, federal habeas jurisdiction also can evolve through common law decision-making.

This raises the question: Even if habeas jurisdiction has never before included the type of claim Trinidad raises, why not start today? That is, why shouldn't we embrace the evolution of habeas review so as to encompass a claim that challenges extradition on the basis of the conditions the extraditee may face in the receiving country?

To that question, my colleagues give entirely convincing answers. I need not add to Judge Tallman's masterful discussion of how superior the executive is to the judiciary in assessing a detainee's likely treatment in a foreign country and in weighing the foreign policy implications pregnant in every decision to extradite or not to extradite. Tallman dissent at 6440-41. Nor need I do more than echo Judge Thomas's conclusion that "the surrender of a person to a foreign government is within the Executive's powers to conduct foreign affairs and the executive is 'well situated to consider sensitive foreign policy issues.' " Thomas conc. at 6409 (quoting *Munaf*, 553 U.S. at 702). Nor are these new answers. We explained almost half a century ago that, even as Supreme Court decisions broadened the scope of habeas review of criminal convictions, "[w]e believe such case[s] to be inapposite in the field of international extradition." *Merino* v. *U.S. Marshal*, 326 F.2d 5, 11 (9th Cir. 1963); *see* Semmelman, *Federal Courts*, *supra*, at 1229-36 (providing policy reasons for leaving extradition decisions to the executive branch). International relations have become no less delicate since, and we, as federal judges, have become no better at diplomacy.

\* \* \*

I'm a firm believer in robust federal habeas review where it's appropriate. *See, e.g.*, *Gantt* v. *Roe*, 389 F.3d 908 (9th Cir. 2004); *Taylor* v. *Maddox*, 366 F.3d 992 (9th Cir. 2004). But

the federal habeas statute is not an open-ended invitation for federal judges to join the party whenever they're invited by someone who happens to be "in custody." 28 U.S.C. § 2241(c), (d). Petitioning for the Great Writ, like filing most lawsuits, requires a cognizable cause of action. Exercising federal jurisdiction to hear a habeas petition requires the same. Centuries of case law show that Trinidad fails to present such a claim, and my colleagues show why there's wisdom in that practice. They simply fail to take that teaching to its logical conclusion. I therefore dissent as to Trinidad's CAT claim, and would order the district court to dismiss that claim for lack of jurisdiction.